UNITED STATES DISTRICT COURT                         FA6117
EASTERN DISTRICT OF NEW YORK

_____

Michael KAMBUROWSKI *et ux.*,

            *Plaintiff*,

*v.*

Michael KIDD, Deportation Officer, U.S.
Immigration and Customs Enforcement, and
John CARBONE, (former) Acting Field
Director, U.S. Immigration and Customs
Enforcement,

            *Defendants*.
_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 05-CV-0953 (CBA/RLM)

(Amon, J.)
(Mann, M.J.)

MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT,
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

BENTON J. CAMPBELL
United States Attorney

F. FRANKLIN AMANAT (FA6117)
Assistant United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201-2776
(718) 254-6024

*Attorneys for Defendants*

Dockets.Justia.com

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................... iv

PRELIMINARY STATEMENT................................................. 1

STATEMENT OF FACTS................................................... 2

ARGUMENT............................................................ 5

I.   TO THE EXTENT THE AMENDED COMPLAINT PURPORTS TO ASSERT CLAIMS
SOUNDING IN COMMON LAW TORT, IT MUST BE DISMISSED FOR LACK OF
SUBJECT MATTER JURISDICTION........................................ 5

    A.   Defendants Kidd and Carbone, Sued in their Individual
Capacities, Have Absolute Immunity from Claims Alleging
Common Law Torts Committed in the Course and Scope of their
Employment........................................................ 6

    B.   Even after Substituting the United States for Kidd and Carbone as
a Party Defendant, the Court Must Dismiss the Complaint under
the Federal Tort Claims Act....................................... 7

        1.   Plaintiffs Failed to Exhaust Their Administrative Remedies
Prior to Filing Suit............................................ 8

        2.   Neither Kamburowski's Belated Submission of an
Administrative Tort Claim, Nor the Filing of the Amended
Complaint, Provides this Court with a Basis to Assume
Jurisdiction over His Common Law Tort Claims.............. 10

        3.   Even Assuming Administrative Remedies Have Been
Exhausted, the Court Must Dismiss the Common Law Tort
Claims Because there is No Basis for Government Liability
under State Law................................................ 13

            a.   All Common Law Tort Claims Asserting Infliction
of Emotional Distress Must Be Dismissed, as They
Are Not Cognizable Under New York State Law........ 14

            b.   All Common Law Tort Claims Asserting False
Arrest, False Imprisonment, and Malicious
Prosecution Must Be Dismissed, as Kidd Had
Probable Cause to Arrest Kamburowski............... 15

II.  To the Extent the Complaint Asserts Claims of Constitutional Tort Against Kidd and Carbone in Their Individual Capacities, the INA Bars Consideration of Such Claims.......................... 21

    A.  The Comprehensive Scheme for Resolving Immigration Disputes Between Aliens and the Government, Established in the INA, Forecloses an Implied *Bivens* Remedy Against Individual Federal Employees.................................................. 21

    B.  The INA Expressly Deprives this Court of Subject Matter Jurisdiction to Entertain Kamburowski's *Bivens* Claims............... 30

III.  To the Extent the Amended Complaint Purports to Assert Claims of Constitutional Tort Against Kidd and Carbone in Their Individual Capacities, It Must Be Dismissed on the Basis of Kidd's Qualified Immunity from Suit and Carbone's Lack of Personal Involvement in the Events Alleged in the Complaint................ 33

    A.  Kidd is Entitled To Qualified Immunity Because Kamburowski Has Failed to Adduce Evidence of a Constitutional Violation............ 33

    B.  The Bivens Claims Against Carbone Must Be Dismissed, Because There is No Allegation, Much Less Evidence, that he was Personally Involved in Any Way in Kamburowski's Arrest or Subsequent Detention......................................... 38

Conclusion. ........................................................ 41

FEDERAL CASES

*Adams v. HUD*, 807 F.2d 318 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Adams v. Johnson*, 355 F.3d 1179, 1184 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Albright v. Oliver*, 510 U.S. 266 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Alsaifullah v. Travis*, 160 F. Supp. 2d 417 (E.D.N.Y. 2001). . . . . . . . . . . . . . . . . . . . . . . . 40

*Anderson v. Creighton*, 483 U.S. 635 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Arar v. Ashcroft*, 414 F. Supp.2d 250 (E.D.N.Y. Feb. 16, 2005). . . . . . . . . . . . . . . . . . . . . 32

*Arnsberg v. United States*, 757 F.2d 971, 978-79 (9th Cir. 1984). . . . . . . . . . . . . . . . . . . . 16

*Awabdy v. City of Adelanto*, 368 F.3d 1062 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . 34

*Barbera v. Smith*, 836 F.2d 96 (2d Cir. 1987), *cert. denied*, 489 U.S. 1065 (1989). . . . . . . . 39

*Barrett ex rel. Estate of Barrett v. United States*, 462 F.3d 28 (1st Cir. 2006). . . . . . . . . . . . . 12

*Behrens v. Pelletier*, 516 U.S. 299 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Benjamin v. United States*, 554 F. Supp. 82 (E.D.N.Y. 1982). . . . . . . . . . . . . . . . . . . . . . . . 15

*Bernard v. United States*, 25 F.3d 98 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . 15, 17, 19, 20

*Brown v. Hendershot*, 2006 WL 2707432 (M.D. Pa. Sept. 19, 2006). . . . . . . . . . . . . . . . . . 12

*Bush v. Lucas*, 462 U.S. 367 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

*Butz v. Economou*, 438 U.S. 478 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Caban v. United States*, 728 F.2d 68 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Castro v. United States*, 34 F.3d 106 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Ceballos*, 812 F.2d 42 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

*Chappell v. Wallace*, 462 U.S. 296 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-25

*Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001). . . . . . . . . . . . . . . . . . . . . 22, 23

*Covington v. City of New York*, 171 F.3d 117 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . 15

*Demore v. Kim*, 538 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27

*Devenpeck v. Alford*, 543 U.S. 146 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Dirienzo v. United States*, 690 F. Supp. 1149 (D. Conn. 1988). . . . . . . . . . . . . . . . . . . 15

*Dittman v. California*, 191 F.3d 1020 (9th Cir. 1999), *cert. denied*, 530 U.S. 1261 (2000). . 35

*Duamutef v. INS*, 386 F.3d 172 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Dukes v. City of New York*, 879 F. Supp. 335 (S.D.N.Y. 1995). . . . . . . . . . . . . . . . . . . . 19

*Fiallo v. Bell*, 430 U.S. 787 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Fong Yue Ting v. United States*, 149 U.S. 698 (1893). . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Foster v. Townsley*, 243 F.3d 210 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*Gill v. Mooney*, 824 F.2d 192 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Graham v. Connor*, 490 U.S. 386 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Gregory v. Mitchell*, 634 F.2d 199 (5th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 34

*Hines v. City of New York*, No. 94 Civ. 5109 (JSM), 1996 WL 706877
   (S.D.N.Y. Dec. 9, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hoffenberg v. Provost*, 154 Fed. Appx. 307 (3d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . 12

*Holly v. Scott*, 434 F.3d 287 (4th Cir.), *cert. denied*, 126 S. Ct. 2333 (2006). . . . . . . . . . . 23

*Hunter v. Bryant*, 502 U.S. 224 (1991) (per curiam). . . . . . . . . . . . . . . . . . . . . . . . . . 34

*INS v. Aguirre- Aguirre*, 526 U.S. 415 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Kaba v. Stepp*, 458 F.3d 678 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Keene Corp. v. United States*, 700 F.2d 836, 841 (2d Cir.), *cert. denied*,
    464 U.S. 864 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Kotarski v. Cooper*, 866 F.2d 311 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Lanier*, 520 U.S. 259 (1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Libas, Ltd. v. Carillo*, 329 F.3d 1128 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Lindsey v. Loughlin*, 616 F. Supp. 449 (E.D.N.Y. 1985). . . . . . . . . . . . . . . . . . . . . . . . 17

*McNeil v. United States*, 508 U.S. 106, 110 (1993). . . . . . . . . . . . . . . . . . . . . . . 9, 11, 12

*Mitchell v. Forsyth*, 472 U.S. 511 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Moore v. Glickman*, 113 F.3d 988 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*Murphy v. Lynn*, 118 F.3d 938 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080 (8th Cir. 2005), *cert. denied*,
    126 S. Ct. 1908 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Ostrer v. Aronwald*, 567 F.2d 551 (2d Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Picray v. Sealock*, 138 F.3d 767 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Pierson v. Ray*, 386 U.S. 547 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Plyler v. United States*, 900 F.2d 41 (4th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Posr v. Court Officer Shield No. 207*, 180 F.3d 409 (2d Cir. 1994).. . . . . . . . . . . . . . . . 21

*Rambarrat ex rel. Rambarrat v. United States*, 347 F. Supp. 2d 6 (S.D.N.Y. 2004). . . . . . 12, 13

*Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999). . . . . . . . . . . . 31

*Rhoden v. United States*, 55 F.3d 428, 431 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . 16

*Rivera v. United States*, 728 F. Supp. 250 (S.D.N.Y. 1990). . . . . . . . . . . . . . . . . . . . . . . 19

*Rivera v. United States*, 928 F.2d 592 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502 (2d Cir. 1994). . . . . . . . . . . . . . . . . . 9

*Robinson v. Via*, 821 F.2d 913 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Rostker v. Goldberg*, 453 U.S. 57 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Russell v. Smith*, 68 F.3d 33 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . 25

*Satler v. Wainwright*, 802 F.2d 397 (11th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Saucier v. Katz*, 533 U.S. 194 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Schweiker v. Chilicky*, 487 U.S. 412 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26, 27

*Singer v. Fulton County Sheriff*, 63 F.3d 110 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Smith*, 499 U.S. 160 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Solomon v. United States*, 566 F. Supp. 1033 (E.D.N.Y. 1982). . . . . . . . . . . . . . . . . . . . . . . . 8

*Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988) (per curiam) (*en banc*). . . . . . . . . . . . . . 26

*Sparrow v. USPS*, 825 F. Supp. 252 (E.D. Cal. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Stanley*, 483 U.S. 669 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*United States v. Tarangos-Hinojos*, 791 F.2d 1174 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . . 17

*Tenorio v. Murphy*, 866 F. Supp. 92 (E.D.N.Y. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Ting v. United States*, 927 F.2d 1504 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Webster v. United States*, 2005 WL 3031154 (E.D. Cal. Nov. 8, 2005). . . . . . . . . . . . . . . . 12

*Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Whren v. United States*, 517 U.S. 806 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Wilkie v. Robbins*, 127 S. Ct. 2588 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 26, 29, 30

*Williams v. Smith*, 781 F.2d 319 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Williams v. United States*, 2004 WL 906221 (S.D.N.Y. Apr. 28, 2004). . . . . . . . . . . . . . 13

*Zanghi v. Village of Old Brookville*, 752 F.2d 42 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . 17

## STATE CASES

*Boose v. City of Rochester*, 421 N.Y.S.2d 740 (App. Div. 4th Dep't 1979). . . . . . . . . . . . . . 15

*Broughton v. State*, 37 N.Y.2d 451 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21

*Butler v. Delaware Otsego Corp.*, 610 N.Y.S.2d 664 (App. Div. 3rd Dep't 1994). . . . . . . . . 14

*Collins v. Brown*, 514 N.Y.S.2d 538 (App. Div. 3rd Dep't 1987). . . . . . . . . . . . . . . . . . . . 17

*Colon v. City of New York*, 455 N.E.2d 1248, 1249 (N.Y. 1983). . . . . . . . . . . . . . . . . . . . . 19

*Howell v. New York Post Co.*, 612 N.E.2d 699 (N.Y. 1993). . . . . . . . . . . . . . . . . . . . . 14, 15

*McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*, 682 N.Y.S.2d 167
    (App. Div. 1st Dep't 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*MacLeay v. Arden Hill Hospital*,  563 N.Y.S.2d 333 (App. Div. 3rd Dep't 1990). . . . . . . . . 14

*Murphy v. American Home Prods. Corp.*, 448 N.E.2d 86 (N.Y. 1983). . . . . . . . . . . . . . . . . 15

*Shapiro v. County of Nassau*, 609 N.Y.S.2d 234 (App. Div. 2nd Dep't 1994). . . . . . . . . . . . 14

*Stuart v. Porcello*, 603 N.Y.S.2d 597 (App. Div. 3rd Dep't 1993). . . . . . . . . . . . . . . . . . . . 14

*Torian v. Lumberman's Mut. Cas. Co.*, 502 N.Y.S.2d 105 (App. Div. 3rd Dep't 1986). . . . . 14

## FEDERAL STATUTES

8 U.S.C. § 1226. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 29, 31

8 U.S.C. § 1227. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

8 U.S.C. § 1231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 28, 31, 35

<u>**Page**</u>

8 U.S.C. § 1252. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30-33

28 U.S.C. § 1346. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13, 16

28 U.S.C. §§ 2401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 2675. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 12

28 U.S.C. § 2679. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

<u>FEDERAL REGULATIONS</u>

8 C.F.R. § 103.6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

8 C.F.R. § 241. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 28, 35

## Preliminary Statement

This case concerns a claim that defendant Michael S. Kidd, a Deportation Officer with U.S. Immigration and Customs Enforcement ("ICE"), unlawfully arrested and falsely imprisoned plaintiff Michael Kamburowski, and in so doing violated his constitutional rights. On January 22, 2004, Kidd executed an administrative arrest warrant that had been issued in August 2001 after Kamburowski, an Australian citizen, absconded from a final order of removal issued *in absentia* by an immigration judge in Virginia. After Kamburowski was arrested, and served 29 days in ICE detention in Queens, he persuaded an immigration judge to vacate the Virginia removal order, on the ground that Kamburowski, who had made no effort to comply with the requirement that he keep the immigration authorities apprized of his whereabouts, had allegedly never received notice of the removal proceedings that had led to the removal order and arrest warrant. The immigration judge in Queens terminated the removal proceedings, and Kamburowski eventually succeeded in adjusting his status to lawful permanent resident. He now contends that, by virtue of his having ultimately been successful before the immigration courts, his arrest and subsequent detention were unlawful and entitle him to compensation from Kidd's personal assets. For this reason, he and his wife sue Kidd, as well as another ICE employee who had no involvement in his arrest (John Carbone), in their individual capacities, for both common law and constitutional torts. He seeks five million dollars in damages.

Defendants Kidd and Carbone now respectfully move to dismiss the Amended Complaint for lack of subject matter jurisdiction or, in the alternative, for summary judgment, and they submit this memorandum of law in support thereof. Moreover, the United States of America, which must be substituted for defendants to the extent plaintiffs assert any viable common law tort claims under the Federal Tort Claims Act, submits this memorandum in support of its motion to dismiss the complaint for lack of subject matter jurisdiction.

For a complete statement of the undisputed facts material to this motion, the Court is respectfully referred to the Statement of Material Facts as to Which No Genuine Issue Remains to Be Tried ("Undisputed Facts"), submitted herewith pursuant to Local Civil Rule 56.1(a) and FED. R. CIV. P. 56(e), as well as to the declarations, exhibits, and deposition testimony annexed thereto.

In brief, on the morning of January 22, 2004, Kamburowski went to the Garden City office of U.S. Citizenship and Immigration Services ("CIS"), accompanied by his wife Gina and his attorney Michael J. DiRaimondo, for an interview in connection with his application for adjustment of status. Unbeknownst to Kamburowski, he was the subject of an outstanding warrant of deportation (a form of administrative arrest warrant) and a final order of removal that had been entered against him in Arlington, Virginia. An immigration judge in Arlington entered the final order of removal *in absentia* in May 2001, after Kamburowski had twice failed to show up for scheduled hearings to answer charges of removal that the former INS had filed against him in December 2000. Those charges alleged that Kamburowski had overstayed his tourist visa and had worked in this country without authorization.

Kamburowski claims that he never received notice of those charges, of the removal proceedings they engendered, of the hearings scheduled in those proceedings, of the final order of removal entered against him, or of the warrant of deportation that the INS District Director in Arlington issued in August 2001. He claims that the INS and/or the immigration court had mailed all of those items to a former address that was no longer current as of the time of the removal proceedings, and that the items were never forwarded to him at his then current address. However, Kamburowski had admittedly made no effort to keep the INS apprized of his

whereabouts, as he was required to do under the agency's regulations, and he had never filed with the INS or with the immigration court the forms required to notify them of his changes of address. The INS and the immigration court had mailed the papers to addresses that they had on file, and, with the exception of one document generated after the warrant of deportation was issued, none of these papers was returned by the Postal Service as undeliverable.

Regardless, in July 2004, some six months after the arrest at issue in this case, Kamburowski presented his allegations concerning lack of notice to an immigration judge in Queens, who, accepting their truth, vacated the final order of removal entered *in absentia* in 2001 and terminated without prejudice the removal proceedings that had been initiated in December 2000. However, as of the time Kamburowski went to the CIS office in Garden City for his adjustment interview in January 2004, his immigration file contained a valid final order of removal and a valid warrant of deportation (which, again, is a form of administrative arrest warrant). Armed with clear evidence that Kamburowski was a fugitive from justice, the official charged with adjudicating the adjustment application called defendant Kidd, who at the time was a Deportation Officer in the Fugitive Operations Team of ICE. Shortly thereafter, Kidd arrived with his partner at the Garden City CIS office, where he proceeded to personally review Kamburowski's immigration file.

After confirming that the file contained a valid final order of removal signed by an immigration judge and a valid warrant of deportation signed by an INS District Director, Kidd determined that he had probable cause to place Kamburowski under arrest. Kamburowski and his attorney urged Kidd not to arrest Kamburowski, arguing that Kamburowski had never received notice of the proceedings that led to the order of removal and the warrant, since the notices had allegedly been sent to the wrong address. However, Kidd determined that he did

not have the authority NOT to arrest Kamburowski, or to defer arrest or inspection to a later date. He concluded that, while the circumstance of non-receipt of notice may be relevant in the context of a motion to reopen filed with an immigration judge or an appeal before the BIA, there was no indication in the file that such a motion or appeal was pending or had ever been filed. Moreover, in the presence of a signed final order of removal and a signed warrant of deportation, the alleged error in the address on the notices was irrelevant to Kidd's decision whether to execute the removal order and arrest the fugitive alien. It is the function of an immigration judge, not a deportation officer, to investigate and review allegations of this nature. In any event, nothing in the file suggested to Kidd that the notice of removal proceedings had been returned to the INS as undeliverable or as improperly addressed.

The arrest itself took place without incident. In due course, Kidd transported Kamburowski to what was then called the Wackenhut Detention Facility, a privately-operated facility in Queens that the former INS and its successor ICE used to house and detain non-criminal aliens. All tolled, Kamburowski spent 29 days at Wackenhut. During that time, he successfully petitioned the immigration courts to reopen his 2001 removal proceedings and to release him from custody on bond. On February 20, 2004, after his wife posted the $7,500 bond set by the immigration judge, Kamburowski was released from ICE custody at Wackenhut.

<u>ARGUMENT</u>

I.        **TO THE EXTENT THE AMENDED COMPLAINT PURPORTS TO ASSERT CLAIMS SOUNDING IN COMMON LAW TORT, IT MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.**

Most of the allegations and causes of action set forth in the Amended Complaint relate not to claims that defendants Kidd and Carbone violated Kamburowski's constitutional rights but rather to claims that Kidd and Carbone committed garden variety common law torts – namely, the torts of false arrest, false imprisonment, malicious prosecution, and intentional and negligent infliction of emotional distress.

For example, the Second Cause of Action asserts that "defendants intentionally caused the false imprisonment of Plaintiff Michael Kamburowski," the Third Cause of Action alleges that "plaintiff Michael Kamburowski suffered severe emotional distress during the time of his false imprisonment and as a result of the Defendants' intentional actions," and the Fourth Cause of Action makes the same emotional distress allegation but attributes the distress to "the Defendants' negligent actions." Am. Compl. ¶¶ 41, 44, 46. Similarly, the Ninth Cause of Action avers that "defendants recklessly, carelessly, and negligently harmed plaintiffs by causing the unlawful imprisonment of plaintiff Michael Kamburowski," while the Tenth Cause of Action asserts that "Defendants maliciously prosecuted Plaintiff Michael Kamburowski, thereby causing his unlawful imprisonment and detention," and that they "wrongfully instituted the arrest and detention of Plaintiff Michael Kamburowski without probable cause . . . thereby causing him . . . embarrassment and severe emotional distress." Am. Compl. ¶¶ 56, 58, 59. The causes of action asserted by plaintiff Gina Kamburowski are in the same vein, asserting that she "suffered severe emotional distress during the time her husband was falsely imprisoned," as a result of the

defendants' intentional and negligent actions." Fifth Cause of Action, Am. Compl. ¶¶ 48. *See also* Am. Compl. ¶¶ 32-34.

It is undisputed that, during all times relevant to this action, and in taking all of the actions that the complaint accuses them of taking, Kidd and Carbone were acting in the course of their employment as agents and officers of the former INS. Undisputed Facts ¶ 147. The Attorney General certified as much on June 20, 2005, *see* Exh. 3 (annexed to the Declaration of F. Franklin Amanat), and the amended complaint concedes that Kidd and Carbone are being sued for actions they allegedly took *as immigration officers*. Am. Compl. ¶¶ 5, 6, 22-24.

However, as elaborated below, the Federal Tort Claims Act ("FTCA") is the exclusive remedy available to a plaintiff for any wrongful act or omission committed by a federal employee acting within the scope of his employment, and federal employees enjoy absolute immunity from suits for common law torts brought against them in their individual capacities. Moreover, to the extent the United States is substituted for Kidd and Carbone with respect to plaintiffs' common law tort claims, the United States enjoys sovereign immunity from suit, both because plaintiffs have failed to exhaust their administrative remedies as required by the FTCA, and because there is no basis under New York state law for assessing tort liability against the United States in consequence of the actions of Kidd and Carbone.

A. **Defendants Kidd and Carbone, Sued in their Individual Capacities, Have Absolute Immunity from Claims Alleging Common Law Torts Committed in the Course and Scope of their Employment.**

As noted above, it is undisputed that, during all times relevant to this action, Kidd and Carbone were acting in the course and scope of their employment as agents and officers of the former INS, and the Attorney General certified as much on June 20, 2005. *See* Undisputed

Facts ¶ 147.  As such, they enjoy absolute immunity from suits for common law torts brought against them in their individual capacities, the plaintiffs' exclusive remedy being a suit against the United States pursuant to the FTCA.  *See* 28 U.S.C. § 2679(b)(1); *United States v. Smith*, 499 U.S. 160, 165-66 (1991) ("'the remedy' against the Government under the FTCA 'is exclusive of any other civil action or proceeding for money damages . . .  against the employee' . . .  'any other civil action or proceeding for money damages . . .  against the employee . . .  is precluded.' 28 U.S.C. § 2679(b)(1)"); *Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994) ("government employees [are] immune from common-law tort claims for acts committed within the scope of their employment"); *Rivera v. United States*, 928 F.2d 592, 608-09 (2d Cir. 1991). As a result, the complaint against Kidd and Carbone must be dismissed for lack of subject matter jurisdiction to the extent it seeks to collect damages from them in their individual capacities based on allegations of common law intentional or negligent torts.

> **B.**     **Even after Substituting the United States for Kidd and Carbone as a Party Defendant, the Court Must Dismiss the Complaint under the Federal Tort Claims Act.**

Under the FTCA, when the Attorney General certifies that defendants sued in their individual capacities are federal employees "acting within the scope of [their] office or employment at the time of the incident out of which the claim arose," as happened here,

> any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of [the FTCA] . . ., and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1).  Thus, while the common law tort claims brought against Kidd and Carbone in their individual capacities must be dismissed on account of their absolute immunity, the Court can treat such claims as having been asserted against the United States and must

substitute the United States for Kidd and Carbone as defendants.  The FTCA does provide a limited waiver of the sovereign immunity of the United States for certain common law torts. *See* 28 U.S.C. §§ 1346(b), 2671-2680.  However, once substitution takes place, the action becomes subject to all of the exceptions to the waiver of sovereign immunity which apply under the FTCA.  28 U.S.C. § 2679(d)(4).[1]

As shown below, even after the United States is substituted for Kidd and Carbone as a party defendant on the common law tort claims, the Court must dismiss the complaint for lack of subject matter jurisdiction under the FTCA because (1) plaintiffs failed to exhaust their administrative remedies prior to filing suit, and (2) plaintiffs can prove no set of facts which would establish the liability of the United States under New York state tort law.

1.       **Plaintiffs Failed to Exhaust Their Administrative Remedies Prior to Filing Suit.**

A plaintiff seeking federal subject matter jurisdiction under the FTCA must exhaust his administrative remedies *prior to filing suit*, by filing a timely administrative tort claim with the appropriate agency.  28 U.S.C. §§ 2401(a), 2675(a).  The FTCA provides that:

> An action **shall not** be instituted upon a claim against the United States for money damages for . . . personal injury . . . **unless** the claimant shall have **first** presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. . . .

28 U.S.C. § 2675(a) (emphasis added).

---

[1]       Any suit brought under the FTCA must strictly comply with the terms and conditions of the waiver of sovereign immunity contained in that statute.  *See Adams v. HUD*, 807 F.2d 318, 321 (2d Cir. 1986) (requirements of 28 U.S.C. § 2675(a) must be strictly construed and are jurisdictional in nature and cannot be waived); *Solomon v. United States*, 566 F. Supp. 1033, 1035 (E.D.N.Y. 1982) ("Compliance with the statute of limitations under the FTCA is a jurisdictional prerequisite and noncompliance results in the claim being forever barred.").

The Supreme Court has unequivocally held that the statutory "command that an 'action shall not be instituted . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail' is unambiguous," *McNeil v. United States*, 508 U.S. 106, 110 (1993) (quoting 28 U.S.C. § 2675). The plain meaning of 28 U.S.C. § 2675, the Court held, demonstrates Congressional intent to require the complete exhaustion of administrative remedies "*before* invocation of the judicial process." 508 U.S. at 112 (emphasis added).

Here, plaintiffs filed this action on February 18, 2005. It is undisputed that, prior to that date, plaintiffs had never filed with ICE or with any other agency an administrative tort claim relating to or arising out of Kamburowski's January 22, 2004, arrest and subsequent detention. Undisputed Facts ¶ 149. The original complaint in this action makes no mention of any such claim having ever been filed, and plaintiffs never produced or referenced any evidence of any such claims in response to the government's discovery requests.

In the absence of any evidence that either plaintiff ever filed the requisite administrative tort claim prior to instituting this action, the matter is closed. This Court lacks subject matter jurisdiction over plaintiffs' common law tort claims and has no choice but to dismiss them. *See McNeil v. United States*, 508 U.S. at 112; *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994); *Keene Corp. v. United States*, 700 F.2d 836, 841 (2d Cir.), *cert. denied*, 464 U.S. 864 (1983) (FTCA's administrative exhaustion rule is a jurisdictional requirement which cannot be waived); *Tenorio v. Murphy*, 866 F. Supp. 92, 98 (E.D.N.Y. 1994).

2. **Neither Kamburowski's Belated Submission of an Administrative Tort Claim, Nor the Filing of the Amended Complaint, Provides this Court with a Basis to Assume Jurisdiction over His Common Law Tort Claims.**

On June 30, 2005 – 132 days after the complaint was filed in this action – Kamburowski, through counsel, submitted to ICE a Standard Form 95 Claim for Damage, Injury, or Death. Undisputed Facts ¶ 148. The administrative tort claim, which was signed and filed only by Kamburowski (and not by his wife (*see* Undisputed Facts ¶ 150)),[2/] asserted that "on January 22, 2004, the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE) illegally and wrongfully arrested and detained Michael Kamburowski at 711 Stewart Avenue, Garden City, N.Y. 11530." Exh. 3, at 10. As injury, the claim form describes "illegal and wrongful incarceration and detention for approximately 30 days," causing "loss of employment and wages," on account of which the claim seeks $5 million in compensation. *Id*. Neither plaintiff had ever filed an administrative tort claim with ICE, or with any other agency, at any time prior to June 30, 2005, relating to or arising out of Kamburowski's January 22, 2004, arrest and subsequent detention. Undisputed Facts ¶ 149. On July 22, 2005, ICE advised Kamburowski that his administrative claim was incomplete and requested that additional materials be submitted in support of the claim. Undisputed Facts ¶ 151. Kamburowski did not submit the requested materials until some time after October 5, 2005. Undisputed Facts ¶ 152. On October 17, 2005, ICE advised counsel for Kamburowski that it was denying Kamburowski's administrative claim. Undisputed Facts ¶ 153.

---

[2/] Plaintiff Gina Kamburowski has never filed an administrative tort claim with ICE or with any other agency, at any time, relating to or arising out of Kamburowski's January 22, 2004, arrest and subsequent detention. Undisputed Facts ¶ 150. Accordingly, her common law tort claims must be dismissed regardless of any efforts at exhaustion her husband may have undertaken.

On December 2, 2005, plaintiffs filed an amended complaint. This pleading was identical to the original complaint in all particulars, except that it added a new paragraph 37 alleging as follows:

> Plaintiff Michael Kamburowski[3/] filed an administrative claim under the Federal Tort Claims Act ("FTCA") with the Department of Homeland Security, Bureau of Immigration and Customs Enforcement ("ICE"). On October 17, 2005, ICE denied the claim. Therefore, the plaintiff has exhausted all of his administrative remedies.

Am. Compl. ¶ 37. The amended complaint thus did not allege that any administrative tort claim had been filed with ICE or any other agency prior to the claim which ICE denied on October 17, 2005, which had been submitted almost six months after the case was instituted.

Despite the belated filing of the administrative tort claim and the minimal amendment to the pleading engendered by that claim's denial, plaintiffs did not exhaust their administrative remedies prior to filing suit, as required by the FTCA, and they therefore cannot avail themselves of this Court's subject matter jurisdiction to entertain their common law tort claims. In *McNeil*, the Supreme Court held that a prematurely-filed FTCA action could not be heard, even if the plaintiff exhausted her administrative remedies soon after the filing of the action. *McNeil*, 508 U.S. at 111. The Supreme Court described the rationale behind this principle as follows:

> Every premature filing of an action under the FTCA imposes some burden on the judicial system and on the Department of Justice which must assume the defense of such actions. Although the burden may be slight in an individual case, the statute governs the processing of a vast multitude of claims. The interest in orderly administration of this body of litigation is best served by adherence to the straight-forward statutory command.

*McNeil*, 508 U.S. at 112.

---

[3/] Note the absence of mention of any administrative claim filed by plaintiff Gina Kamburowski.

In applying *McNeil*, courts have held that an FTCA action is "instituted" on the date on which the original complaint is filed:

> According to the Supreme Court, "the word 'institute' is synonymous with the words 'begin' and 'commence.'" *McNeil v. United States*, 508 U.S. 106, 112 (1993). Pursuant to Rule 3 of the Federal Rules of Civil Procedure, "[a] civil action is commenced by filing a complaint with the court." Thus, an action is instituted for purposes of section 2675(a) when the complaint is filed. *See McNeil*, 508 U.S. at 112 (rejecting the argument that an action is instituted when "substantial progress has been made in the litigation").

*Barrett ex rel. Estate of Barrett v. United States*, 462 F.3d 28, 37 (1st Cir. 2006). Further, 28 U.S.C. § 2675 requires that jurisdiction for FTCA claims must exist at the time the original complaint is filed, not some later point in time. *See Kaba v. Stepp*, 458 F.3d 678, 687 (7th Cir. 2006) (dismissing prematurely filed action even though exhaustion period concluded during pendency of judicial action and a new action would be time-barred under § 2401(b)); *Plyler v. United States*, 900 F.2d 41, 42 (4th Cir. 1990) ("Since the district court had no jurisdiction at the time the action was filed, it could not obtain jurisdiction by simply not acting on the motion to dismiss until the requisite [six month] period [under § 2675] had expired."); *Gregory v. Mitchell*, 634 F.2d 199, 204 (5th Cir. 1981); *Rambarrat ex rel. Rambarrat v. United States,* 347 F. Supp. 2d 6, 9 (S.D.N.Y. 2004) (jurisdictional defect cannot be remedied by exhausting administrative remedies during pendency of suit). Thus, an action is instituted when the initial complaint is filed, and that date determines whether jurisdiction exists for the FTCA claim.

An amended complaint cannot cure the jurisdictional defect of a prematurely filed action. *See Hoffenberg v. Provost*, 154 Fed. Appx. 307 (3d Cir. 2005)("the amended complaint cannot serve as the date the federal suit was 'instituted'"); *Brown v. Hendershot*, 2006 WL 2707432, at *4 (M.D. Pa. Sept. 19, 2006)("The filing of an amended complaint does not cure the defect."); *Webster v. United States*, 2005 WL 3031154, at *2 (E.D. Cal. Nov. 8, 2005) (dismissing with prejudice and noting that "a plaintiff cannot bring a FTCA action prematurely

and then subsequently amend his complaint after denial of the administrative claim because the district court lacks jurisdiction over an FTCA action filed before the exhaustion requirement of Section 2675(a) is satisfied"); *Rambarrat*, 347 F. Supp.2d at 9 (amended complaint will not cure defect; new action necessary); *Williams v. United States*, 2004 WL 906221, *3 (S.D.N.Y. Apr. 28, 2004) (same); *Hines v. City of New York*, No. 94 Civ. 5109 (JSM), 1996 WL 706877, at *1 (S.D.N.Y. Dec. 9, 1996) ("[P]laintiff cannot rely on an amended complaint when the original complaint . . . was premature . . . . [P]laintiff cannot proceed unless he brings a new action within six months after the administrative denial of his claim."); *Sparrow v. USPS*, 825 F. Supp. 252, 254-55 (E.D. Cal. 1993) (same).

Because Kamburowski did not even attempt to exhaust his administrative remedies until well after this suit was instituted, and because his wife never even undertook any efforts at exhaustion, their putative FTCA claims against the United States must be dismissed.

> 3. **Even Assuming Administrative Remedies Have Been Exhausted, the Court Must Dismiss the Common Law Tort Claims Because there is No Basis for Government Liability under State Law.**

Even assuming *arguendo* that plaintiffs could somehow show that they exhausted their administrative remedies, they must still satisfy the other requirements of the FTCA before this Court can assume jurisdiction over their common law tort claims. One of those requirements is that they establish that the United States, "if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346. In other words, in order to avail themselves of the waiver of sovereign immunity which potentially allows them to sue the United States for common law torts under the FTCA, plaintiffs must demonstrate that, under New York state law, the evidence in support of their complaint would sustain a cause of action for tort liability. As elaborated below, plaintiffs cannot make such a showing, and their complaint must therefore be dismissed.

a. **All Common Law Tort Claims Asserting Infliction of Emotional Distress Must Be Dismissed, as They Are Not Cognizable Under New York State Law.**

Most of the causes of action set forth in the Amended Complaint advance a species of emotional distress claim – *i.e.,* a claim that, by arresting Kamburowski and subjecting him to ICE detention, federal agents either intentionally or negligently caused Kamburowski and his wife to experience emotional distress and "embarrassment." *See, e.g.,* Am. Compl. ¶¶ 34, 44, 45, 46, 48, 50, 59. For three reasons, all of these causes of action must be dismissed.

First, it is well established that conduct which falls within the scope of another tort (such as false arrest, false imprisonment, malicious prosecution, etc.) is not actionable as intentional infliction of emotional distress. *See McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.,* 682 N.Y.S.2d 167, 169 (App. Div. 1st Dep't 1998); *Butler v. Delaware Otsego Corp.,* 610 N.Y.S.2d 664, 665-666 (App. Div. 3rd Dep't 1994).

Second, the arrest and detention of an individual who is ultimately acquitted or otherwise vindicated by the courts is not, as a matter of law, sufficiently extreme and outrageous conduct to sustain the tort of intentional infliction of emotional distress. *See, e.g., Shapiro v. County of Nassau,* 609 N.Y.S.2d 234, 234 (App. Div. 2nd Dep't 1994); *Stuart v. Porcello,* 603 N.Y.S.2d 597, 600 (App. Div. 3rd Dep't 1993); *MacLeay v. Arden Hill Hospital,* 563 N.Y.S.2d 333, 335 (App. Div. 3rd Dep't 1990); *Torian v. Lumberman's Mut. Cas. Co.,* 502 N.Y.S.2d 105, 106 (App. Div. 3rd Dep't 1986).[4]

---

[4] Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *See Howell v. New York Post Co.,* 612 N.E.2d 699 (N.Y. 1993). "'Liability has been found only where the conduct has been so outrageous in character, and so extreme in

(continued...)

Finally, to the extent plaintiffs press a claim of negligent, as opposed to intentional, infliction of emotional distress, New York law bars recovery under general negligence principles on a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution. *See Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994); *Boose v. City of Rochester*, 421 N.Y.S.2d 740, 743 (App. Div. 4th Dep't 1979); *see also Dirienzo v. United States*, 690 F. Supp. 1149, 1155 (D. Conn. 1988) (construing New York law).

> **b.    All Common Law Tort Claims Asserting False Arrest, False Imprisonment, and Malicious Prosecution Must Be Dismissed, as Kidd Had Probable Cause to Arrest Kamburowski.**

The remaining common law tort allegations in the Amended Complaint advance claims of false arrest, false imprisonment,[5] and malicious prosecution. Am. Compl. ¶¶ 32, 39, 41, 42, 44, 46, 48, 50, 52, 54, 56, 58, 59. These claims are all predicated on the allegation that federal agents acted unlawfully in arresting Kamburowski on January 22, 2004, and in detaining him at the Wackenhut Detention Center for 29 days. For the reasons set forth below, these claims must all be dismissed.

---

[4]    (...continued)
degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.' " *Id*. at 701 (quoting *Murphy v. American Home Prods. Corp.*, 448 N.E.2d 86 (N.Y. 1983). Thus, "[i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." RESTATEMENT (SECOND) OF TORTS, § 46 cmt. d (1965). Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance. *See id*. at § 46 cmt. h; *see also Howell*, 612 N.E.2d at 703.

[5]    "False arrest is simply an unlawful detention or confinement brought about by means of an arrest rather than in some other way and is in all other respects synonymous with false imprisonment." *Covington v. City of New York*, 171 F.3d 117, 125 (2d Cir. 1999); *see also Weyant v. Okst*, 101 F.3d 845, 853 (2d Cir. 1996) (describing false arrest as "a species of false imprisonment"); *Benjamin v. United States*, 554 F. Supp. 82 (E.D.N.Y. 1982).

As explained above, the liability of the United States under the FTCA must be determined "in accordance with the law of the place where the [allegedly tortious] act or omission occurred." 28 U.S.C. § 1346(b). Although this principle normally directs application of state law, it is well-established that if federal law authorizes the arrest, then the arrest is lawful. *See Caban v. United States*, 728 F.2d 68, 74 (2d Cir. 1984); *cf. Rhoden v. United States*, 55 F.3d 428, 431 (9th Cir. 1995). This is because, in FTCA actions challenging the propriety of an arrest or detention, the proper source for determining the federal government's liability is the law governing the propriety of arrests by federal law enforcement officers, which includes both state and federal law. *See Ting v. United States*, 927 F.2d 1504, 1514 (9th Cir. 1991); *Arnsberg v. United States*, 757 F.2d 971, 978-79 (9th Cir. 1984).

Here, federal law authorized—indeed required—Kamburowski's arrest and detention. Section 241 of the INA, requires, with limited exceptions not applicable here, that "the Attorney General *shall* detain" any alien who has been ordered removed. 8 U.S.C. § 1231(a)(2) (emphasis added). Moreover, 8 C.F.R. § 241.3 provides that, once an immigration court issues a final order of removal with respect to an alien, that alien, if in the United States, "*will be taken into custody* pursuant to the warrant of removal." (Emphasis added.). On the basis of this statute and regulation, standing alone, Kamburowski's arrest and subsequent detention were authorized and proper, and they provide no basis for tort liability against the United States. Succinctly stated, once the immigration judge in Arlington entered a final order of removal against Kamburowski on May 31, 2001, and until that order was vacated by an immigration judge on July 16, 2004, Kamburowski's arrest by federal immigration officers, and his detention pending physical removal from the country, were mandated by federal law and therefore cannot form the basis for a suit on false arrest or false imprisonment grounds under the FTCA.

Moreover, even aside from the requirements of federal law, arrest and confinement are privileged against suit under New York state law where, prior to the arrest, there has been a finding of probable cause for arrest. *See, e.g., Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995); *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994); *Zanghi v. Village of Old Brookville*, 752 F.2d 42, 45 (2d Cir. 1985); *Caban v. United States*, 728 F.2d 68, 72-73 (2d Cir. 1984); *Broughton v. State*, 37 N.Y.2d 451, 456 (1975); *Collins v. Brown*, 514 N.Y.S.2d 538, 540 (App. Div. 3rd Dep't 1987). Probable cause exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed and (2) by the person to be arrested." *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987) (quoting *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983)).

The standard for evaluating the existence of probable cause is an objective one. *Lindsey v. Loughlin*, 616 F. Supp. 449, 451 (E.D.N.Y. 1985). The factors to be considered are factual and practical ones of everyday life on which reasonable and prudent persons, not legal technicians, act. *United States v. Tarangos-Hinojos*, 791 F.2d 1174 (5th Cir. 1986). The crucial issue, therefore, is whether the facts in the possession of the officer at the time plaintiff was arrested were sufficient to establish probable cause for the arrest.

Here, plaintiffs have adduced no evidence that would create a triable issue of fact as to the existence of probable cause to arrest Kamburowski. On January 22, 2004, before Kamburowski arrived at the CIS offices in Garden City for his adjustment of status interview, the officer assigned to adjudicate the application ran mandated security and background checks on Kamburowski, and discovered that he was an alien absconder who had an outstanding warrant of deportation and a final order of removal. Undisputed Facts ¶¶ 66-67. This provided

the officer with clear evidence that Kamburowski was a fugitive, prompting her to call Kidd, a Deportation Officer whose job was to track down and apprehend fugitives. Undisputed Facts ¶¶ 63-64, 68-70. Kidd verified in a separate law enforcement database that Kamburowski had been ordered to leave the country but had failed to comply with the order of removal; he also confirmed that there were no pending motions or appeals in Kamburowski's case, and that a final order of removal had been issued. Undisputed Facts ¶¶ 72-73.

Kidd then proceeded with his partner to Garden City, where he personally examined Kamburowski's immigration file and found both a signed removal order issued by an immigration judge and a signed warrant of deportation. Undisputed Facts ¶¶ 75-77. The final order of removal, dated May 31, 2001, and signed by Immigration Judge John Milo Bryant in Arlington, Virginia, noted that Kamburowski had abandoned any and all claims for relief from removal and directed that he be removed forthwith from the United States to Australia. Undisputed Facts ¶ 81. By examining the contents of the file, Kidd was able to confirm that it was a valid final order of removal. Undisputed Facts ¶ 82.

Meanwhile, the Warrant of Removal/Deportation (Form I-205), signed by the INS District Director in Arlington, Virginia, on August 1, 2001, notified "any officer of the United States Immigration and Naturalization Service" that Kamburowski is subject to removal/deportation from the United States, based upon a final order by an immigration judge in exclusion, deportation, or removal proceedings, and commands said officers "to take into custody and remove from the United States the above-named alien, pursuant to law." Undisputed Facts ¶ 78. A signed Warrant of Removal/Deportation remains valid indefinitely and authorizes a deportation officer immediately to arrest and deport the named subject of the warrant, regardless of any other considerations. Undisputed Facts ¶ 79. The presence in the file

of the signed warrant in itself confirmed the existence of probable cause to make the arrest, and it was neither necessary nor appropriate for Kidd to seek independent verification of the basis for a Warrant of Removal/Deportation by calling the district from which it was issued. Undisputed Facts ¶ 80.[6/]

Based on the facts known to him at that time, Kidd had no reasonable basis to question the validity of the Warrant of Removal/Deportation or the final order of removal. Undisputed Facts ¶ 84. Given the presence in the file of the signed warrant and the immigration judge's signed final order of removal, there was ample probable cause for Kidd to arrest Kamburowski. Undisputed Facts ¶ 85. *See Ceballos*, 812 F.2d at 50.

Kamburowski asserted at the time of his arrest that the final order of removal was invalid because he had not had notice of the immigration proceedings against him; he asserted that both the INS and the immigration court had sent notice of the removal proceedings to him to an address that was not the correct address for Kamburowski at that time. Undisputed Facts ¶¶ 94, 99. In support of this claim, Kamburowski is likely to reference the fact that an immigration judge ultimately accepted his allegations of lack of notice and, on this basis, vacated the final order of removal and terminated the removal proceedings without prejudice. However, the validity of an arrest does not depend upon an ultimate finding of guilt or innocence (or, in this case, removability or non-removability). *Pierson v. Ray*, 386 U.S. 547, 555 (1967). "Rather, the soundness of the arrest hinges on the existence of probable cause." *Dukes v. City of New York*,

---

[6/] Where an official authorized to do so has issued a warrant for a plaintiff's arrest, there is a presumption that probable cause has been found to exist for plaintiff's arrest. *See Bernard*, 25 F.3d at 104; *Rivera v. United States*, 728 F. Supp. 250, 256 (S.D.N.Y. 1990); *Colon v. City of New York*, 455 N.E.2d 1248, 1249 (N.Y. 1983). A plaintiff can only rebut this presumption by showing that the arrest warrant was procured by "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Bernard*, 25 F.3d at 104, *citing Colon*, 60 N.Y.2d at 81. Plaintiff has adduced no evidence of this nature.

879 F. Supp. 335, 340 (S.D.N.Y. 1995). Once an officer has a reasonable basis to believe there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence (i.e., non-removability) before making an arrest. "[P]robable cause can also exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard*, 25 F.3d at 102.

In the presence of a signed final order of removal and a signed Warrant of Removal/Deportation, the alleged circumstance regarding the address on the Notice to Appear (even if true) is irrelevant to the decision whether to execute the removal order and arrest the fugitive alien. Undisputed Facts ¶¶ 100-01, 111. It is the function of an immigration judge, not a Deportation Officer, to investigate and adjudicate allegations that the underlying notice of removal was defective on the basis of lack of notice. Undisputed Facts ¶ 112. Indeed, 8 C.F.R. § 3.23(b)(4)(iii)(A)(1) provides that orders of removal entered in absentia "may be rescinded only upon a motion to reopen filed" with the immigration court, and even then may only be vacated when the alien demonstrates to an immigration judge that the failure to appear was because of exceptional circumstances beyond his control or that he did not receive notice. The filing of such a motion "shall stay the deportation of the alien pending decision on the motion and the adjudication of any properly filed administrative appeal." 8 C.F.R. § 3.23(b)(4)(iii)(C).

Kidd had confirmed the existence of a valid, signed Warrant of Removal/Deportation and a valid, signed final order of removal, and this was all the probable cause that was necessary to take Kamburowski, a fugitive alien, immediately into custody. Undisputed Facts ¶ 113. Thus, arguments and allegations that Kamburowski might wish to raise before an immigration judge or the BIA in the context of a motion to reopen or an appeal simply were not germane to the decision whether to arrest him on the basis of the outstanding warrant. Undisputed Facts ¶ 114.

In the face of indisputable probable cause to arrest him, Kamburowski's claims of false

arrest, false imprisonment, and malicious prosecution[7/] simply cannot survive under the FTCA.

## II. TO THE EXTENT THE COMPLAINT ASSERTS CLAIMS OF CONSTITUTIONAL TORT AGAINST KIDD AND CARBONE IN THEIR INDIVIDUAL CAPACITIES, THE INA BARS CONSIDERATION OF SUCH CLAIMS.

### A. The Comprehensive Scheme for Resolving Immigration Disputes Between Aliens and the Government, Established in the INA, Forecloses an Implied *Bivens* Remedy Against Individual Federal Employees.

As the Supreme Court has acknowledged, suits for money damages against public

officials "frequently run against the innocent as well as the guilty–at a cost not only to the

defendant officials, but to society as a whole." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).

If public servants are both to serve the "public interest in encouraging the vigorous exercise of

official authority," *Butz v. Economou*, 438 U.S. 478, 506 (1978), and to perform their jobs

without the distraction of being sued by individuals adversely affected by their decisions on the

government's behalf, then the law must protect them from baseless suits. *See generally Harlow*,

457 U.S. at 807, 816. Qualified immunity, discussed in Part III below, is one way courts

attempt to forestall meritless personal liability lawsuits. Another is the recognition that

Congress, and not the Judiciary, is in the best position to determine what rights and remedies

---

[7/] Because Kamburowski was never criminally prosecuted for any offense, it is doubtful that he can state a claim for malicious prosecution simply on the basis that he was put in removal proceedings. *See Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (elements of malicious prosecution under New York law are the initiation or continuation of a ***criminal proceeding***, a lack of probable cause for commencing such a proceeding, and actual malice as a motivation for defendant's actions); *Russell v. Smith*, 68 F.2d 33, 36 (2d Cir. 1995); *Broughton v. State of New York*, 37 N.Y.2d 451, 548, *cert. denied*, 423 U.S. 929 (1975). Thus, a plaintiff must show both that the defendant maliciously commenced a criminal proceeding that ended in his favor, and that there was no probable cause for the proceeding. *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1994). Even assuming that the initiation of a removal proceeding constitutes a "prosecution" under state law, it is undisputed here that at the time he was placed into removal proceedings Kamburowski had overstayed his tourist visa and had worked in this country without authorization. Undisputed Facts ¶¶ 2-4, 36. This in itself provided probable cause for commencing the removal proceeding. *See* 8 U.S.C. § 1227(a)(1)(B), (a)(1)(C)(I).

to create, and how best to assure that those rights are protected.  *See, e.g., Bush v. Lucas*, 462 U.S. 367, 389 (1983).  Consequently, where, as here, Congress has created by statute a comprehensive scheme of rights and remedies, courts should not add additional remedies to Congress's handiwork – even when those remedies are sought for violations of the Constitution which are alleged to have occurred in the course of administration of the statutory scheme.  *See, e.g., Bush*, 462 U.S. at 389.  In this case, the INA is such a comprehensive scheme, and it precludes this Court from implying a remedy in damages against Kidd and Carbone for decisions relating to Kamburowski's arrest and detention.  For this reason, the Court should dismiss the Amended Complaint to the extent it purports to assert constitutional tort claims against Kidd and Carbone in their individual capacities.

It is well-established that a court may not provide a *Bivens* remedy to a plaintiff where, as here, Congress has established an elaborate regulatory and remedial scheme to handle a particular category of disputes with the federal government, even where a claimed constitutional injury would otherwise go unredressed. *See Wilkie v. Robbins*, 127 S. Ct. 2588, 2604 (2007); *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988); *Bush v. Lucas*, 462 U.S. 367 (1983).  Because the exercise of the power to imply a new constitutional tort is "not expressly authorized by statute," courts exercise that power, if at all, only with great caution.  *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 66, 68-70, 74 (2001).  For example, in *Bush v. Lucas*, the Supreme Court held that the "comprehensive procedural and substantive provisions" of the Civil Service Reform Act precluded recognition of a *Bivens* remedy even though civil service laws offered "a less than complete remedy" for an alleged First Amendment violation; Congress, the Court held, is better positioned than the courts to carry out the necessary "balancing [of] governmental efficiency and the rights of employees." *Bush*, 462 U.S. at 368, 372-73 & n.9, 378, 389-90.

Nor may any *Bivens* action be implied "when defendants can demonstrate the existence of 'special factors counseling hesitation in the absence of affirmative action by Congress.'" *Moore v. Glickman*, 113 F.3d 988, 991 (9th Cir. 1997) (quoting *Chilicky*, 487 U.S. at 421). Here, the plenary power of the Legislative and Executive Branches of government over immigration (*see Chappell v. Wallace*, 462 U.S. 296 (1983)), and the "presence of a deliberately crafted statutory remedial system" for aliens in immigration proceedings (*Moore*, 113 F.3d at 991), are mutually reinforcing "special factors" showing that Congress's judgment about the remedies that should be made available to aliens ordered removed should not be disturbed.[8/]

Because Congress in immigration matters legislates in an area of plenary power, its legislative judgments in the field of immigration carry almost conclusive weight. Immigration matters "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952). Immigration rules and standards are uniquely within the province of the political

---

[8/]       The Supreme Court has become increasingly reluctant to imply new *Bivens* remedies. As the Fourth Circuit recently explained, "[t]he Court's repeated reluctance to extend *Bivens* is not without good reason. A *Bivens* cause of action is implied without any express congressional authority whatsoever." *Holly v. Scott*, 434 F.3d 287, 289 (4th Cir.), *cert. denied*, 126 S. Ct. 2333 (2006). "The Supreme Court has recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Id.* at 289-90. In *Malesko*, the Supreme Court likewise observed that, in *Bivens*, the Court "rel[ied] largely on earlier decisions implying private damages actions into federal statutes," decisions from which the Court has since "retreated" and that reflect an understanding of private rights of action that the Court has since "abandoned." 534 U.S. at 67 & n.3.1 "The Court has therefore on multiple occasions declined to extend *Bivens* because Congress is in a better position to decide whether or not the public interest would be served by the creation of new substantive legal liability." *Holly*, 434 F.3d at 290 (internal quotation marks omitted). The Eighth Circuit, similarly, has described the Supreme Court's recent decisions in this area as erecting a "presumption against judicial recognition of direct actions for violations of the Constitution by federal officials or employees." *Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir. 2005) (internal quotation marks omitted), *cert. denied*, 126 S. Ct. 1908 (2006). Earlier this year, with its decision in *Wilkie*, the Supreme Court confirmed this trend towards presuming that Congress, rather than the courts, should determine the appropriate remedies to be provided within particular fields of legislation. See *Wilkie* 127 S. Ct. at 2604 (declining to imply a *Bivens* remedy where there was a "reasonable fear that a general *Bivens* cure would be worse than the disease.").

branches because "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Demore v. Kim*, 538 U.S. 510, 522 (2003). And the "inherent and inalienable right of every sovereign and independent nation" to determine which aliens it will admit or expel provides an additional source of the authority of the political Branches over immigration. *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893).

In addition, the federal courts must afford substantial deference to the Executive Branch entities that have been granted authority by Congress to enforce and implement those laws. *INS v. Aguirre- Aguirre*, 526 U.S. 415, 425 (1999) (deference on immigration matters is "especially appropriate" because "officials 'exercise especially sensitive political functions that implicate questions of foreign relations'").

Congress's heightened legislative authority in an area of plenary power is a "special factor" that forecloses an implied *Bivens* remedy. The Supreme Court in *Chappell v. Wallace*, for example, declined to recognize a *Bivens* remedy for enlisted military personnel against their superior officers. *Chappell v. Wallace*, 462 U.S. at 304. See also *United States v. Stanley*, 483 U.S. 669, 682 (1987). The Court emphasized the "special factors" brought to bear by the plenary authority of the Legislative and Executive Branches over military matters (see *id.*, 462 U.S. at 298-99), explaining that the case arose "'in the context of Congress' authority over national defense and military affairs, and perhaps in no other area has the Court accorded Congress greater deference.'" *Id.* at 301 (quoting *Rostker v. Goldberg*, 453 U.S. 57, 64-65 (1981)). Acknowledging that Congress had "not provided a damage remedy for claims by military personnel that constitutional rights have been violated by superior officers," the Court concluded

that "[a]ny action to provide a judicial response by way of such a remedy would be plainly inconsistent with Congress' authority in this field." *Id.* at 304.[9]

      For the same reasons, creating a *Bivens* remedy for aliens taken into custody pursuant to a warrant of removal and a final order of removal would be inconsistent with Congress's broad authority over immigration. Just as the Court recognized in *Chappell* that "perhaps in no other area has the Court accorded Congress greater deference'" than in military matters (462 U.S. at 301), it has in similar language acknowledged that "'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). It is therefore for Congress, rather than the courts, to determine what remedies should be available to aliens under the immigration laws. Implying a supplemental, judicially-created damages action for aliens taken into custody pursuant to a warrant of removal "would be plainly inconsistent with Congress' authority in this field." *Chappell*, 462 U.S. at 304. *See also Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209-210 (D.C. Cir. 1985) (relying upon *Chappell* in declining to imply a *Bivens* remedy into the field of foreign relations).

      "The presence of a deliberately crafted statutory remedial system" also has been recognized as a "'special factor' that precludes a *Bivens* remedy." *Moore v. Glickman*, 113 F.3d at 991. When Congress delineates specific remedial mechanisms within a statutory scheme,

---

[9]    The Court clarified in *United States v. Stanley*, 483 U.S. 669 (1987), that when the courts should refrain from implying a *Bivens* remedy in an area of plenary power, the courts should stay their hand regardless of the legislative scheme Congress has chosen. As the Court explained, the "'special facto[r]' that 'counsel[s] hesitation' is not the fact that Congress has chosen to afford some manner of relief in the particular case, but the fact that congressionally uninvited intrusion into military affairs by the judiciary is inappropriate." *Stanley*, 483 U.S. at 682. Indeed, a *Bivens* remedy is inappropriate in an area of plenary power even where no alternative "legislative scheme" exists to remedy possible wrongs. *See Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209 (D.C. Cir. 1985) ("the special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad").

"[i]mplied remedies premised on violations of constitutional rights are not created to fill in gaps of existing relief to which plaintiffs are already entitled." *Libas, Ltd. v. Carillo*, 329 F.3d 1128, 1130 (9th Cir. 2003). *See also Spagnola v. Mathis*, 859 F.2d 223, 228 (D.C. Cir. 1988) (*per curiam*) (en banc) *(*where Congress has enacted a comprehensive legislative scheme, the court must refrain from implying a supplementary damages remedy unless the *Bivens* plaintiff can show that Congress has "plainly expressed an intention that the courts preserve *Bivens* remedies.").

      The Supreme Court in *Wilkie* recently clarified that courts must first decide whether Congress's provision of alternative remedies warrants the inference that "Congress expected the Judiciary to stay its *Bivens* hand." *Wilkie*, 127 S. Ct. at 2600. Congress in the INA has created the type of complex, precise, and comprehensive set of remedies for aliens that shows that it did not intend the Courts to impose supplementary damages remedies under *Bivens*. For claims arising from the execution of removal orders, Congress has "expressly precluded the creation of [a *Bivens*] remedy by declaring that existing statutes provide the exclusive mode of redress." *Bush v. Lucas*, 462 U.S. at 373. *See* 8 U.S.C. § 1252(a)(5) (providing that "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal," and emphasizing that "judicial review" includes habeas corpus "and review pursuant to any other provision of law (statutory or nonstatutory).").

      For claims such as the false arrest claim at issue here, no *Bivens* remedies should be implied, because Congress itself has decided to provide certain forms of relief to aliens but not others. "When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, [the courts] have not created additional *Bivens* remedies." *Chilicky*,

487 U.S. at 423.  The Ninth Circuit, applying *Chilicky* "broadly," has held that "'where Congress has provided *some* mechanism for relief, *Bivens* claims are precluded.'"  *Adams v. Johnson*, 355 F.3d 1179, 1184 (9th Cir. 2004).  A statutory scheme containing a carefully chosen array of remedies also shows that Congress had remedial issues in mind, and that its decision not to include a statutory damages remedy is therefore not inadvertent.  See *Chilicky*, 487 U.S. at 423 (no *Bivens* remedy may be implied if there are "indications that congressional action has not been inadvertent").  And as the Ninth Circuit has explained, "[s]o long as Congress' failure to provide money damages, or other significant relief, has not been inadvertent, courts should defer to its judgment."  *Kotarski v. Cooper*, 866 F.2d 311, 312 (9th Cir. 1989).

Here, the adequacy of the remedies chosen by Congress must be understood in the immigration context within which these remedies are provided.  "[D]etention during deportation proceedings [is] a constitutionally valid aspect of the deportation process."  *Demore*, 538 U.S. at 523.  Moreover, in crafting the detention provisions, Congress could properly take into account aliens' non-citizen status.  "'In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.'"  *Demore*, 538 U.S. at 521 (quoting *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976)).  In the immigration context, therefore, Congress's judgment about what remedies should be available to aliens detained pending their removal from the country warrants the greatest deference.

The carefully tailored mechanisms that Congress has provided in the INA for aliens seeking to challenge their immigration detention preclude the judicial imposition of supplemental *Bivens* claims.  The INA deals comprehensively with immigration detention.  *See generally*, 8 U.S.C. § 1226(a); *id.* § 1231.  Congress not only authorized but indeed required that aliens such as Kamburowski who are the subject of a final order of removal be arrested and

detained pending their physical removal from the United States. Section 241 of the INA, requires, with limited exceptions not applicable here, that "the Attorney General ***shall*** detain" any alien who has been ordered removed. 8 U.S.C. § 1231(a)(2) (emphasis added). Moreover, 8 C.F.R. § 241.3 provides that, once an immigration court issues a final order of removal with respect to an alien, that alien, if in the United States, "***will be taken into custody*** pursuant to the warrant of removal." (Emphasis added.). Indeed, Congress has broadly provided that *all* aliens are subject to detention during their removal proceedings. *Id.* § 1226(a) ("an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States"). For aliens in removal proceedings, Congress has authorized DHS either to "continue to detain the arrested alien" (*id.*, § 1226(a)(1)), or to release the alien on bond or parole (*id.*, § 1226(a)(2)).

Congress also specified the avenues under which aliens may challenge their immigration detention. Aliens who are taken into custody may invoke the bond procedures authorized by Congress (8 U.S.C. § 1226(a)(2)), and established by DHS and the Attorney General. An alien may ask a DHS district director to approve a bond. See 8 C.F.R. § 103.6(a)(3). If bond is denied, then the alien can obtain review of that decision by an immigration judge (*id.* § 236.1(d)(1); *id.* § 1236.1(d)(1)), and ultimately, if necessary, by the Board of Immigration Appeals. *Id.* § 236.1(d)(3); *id.* § 1236.1(d)(3). In this case, Kamburowski availed himself of these very procedures, ultimately persuading an immigration judge to reduce the amount of the bond requested by the DHS district director and obtaining his freedom by posting that bond. Undisputed Facts ¶¶ 137-38.

An implied damages remedy would be especially inappropriate here, because Congress provided in the detention statute itself that judicial review of DHS's discretionary detention

decisions is to be strictly limited. Congress stated clearly in Section 1226 that a person taken into immigration detention cannot directly challenge that discretionary decision in the federal courts. Indeed, Congress explicitly barred almost all direct judicial review of DHS's discretionary decisions to detain aliens under particular circumstances. 8 U.S.C. § 1226(e) provides that DHS's "discretionary judgment regarding the application of this section shall not be subject to review." It also provides that "[n]o court may set aside any action or decision" by DHS under Section 1226 "regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." *Id.* Congress thus made it clear that DHS's discretionary detention decisions would be reviewed under the administrative bond and parole procedures authorized under Section 1226(a)(2), rather than through actions in the federal courts, and that federal court review would be limited at most to considering legal challenges to custody through *habeas corpus*, without any broader right to judicial review of detention decisions.

Nothing in Section 1226 even remotely implies that, having barred direct judicial review of DHS's decisions to take aliens into custody, Congress intended to leave open an avenue for collateral review of those same decisions, through damages actions against individual immigration officers. On the contrary, that result is both unreasonable and unfair.

This Court should also decline at "*Bivens* step two" (*Wilkie*, 127 S. Ct. at 2600), to imply a damages action into the INA's remedial scheme. Regardless of purely legal considerations, the decision whether to imply a damages remedy always involves a sensitive judgment for the Court about the appropriateness of such a remedy in the particular context in which the case arises. As the Supreme Court in *Wilkie* explained, "even in the absence of an alternative, a *Bivens* remedy is a subject of judgment" for the Court. *Id.*, 127 S. Ct. at 2598.

As in *Wilkie*, this is a case where any damages remedy should come through legislation, rather than judicial intervention. See *Wilkie*, 127 S. Ct. at 2604-05. As discussed above, it is highly significant that Congress in Section 1226(e) barred direct judicial review of the decision at issue here. Furthermore, "'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf." *Wilkie*, 127 S. Ct. at 2605 (quoting *Bush v. Lucas*, 462 U.S. at 389). Moreover, Congress, unlike the courts, "can tailor any remedy to the problem perceived, thus lessening the risk of raising a tide of suits threatening legitimate initiative on the part of the Government's employees." *Wilkie*, 127 S. Ct. at 2605. This Court may imply only one form of remedy – an action for money damages against individual federal employees for their actions taken in public service. Congress, by contrast, need not make government employees, as individuals, responsible for the consequences of government policies because it can authorize relief against the government itself.

Accordingly, this Court should "stay its *Bivens* hand" (*Wilkie*, 127 S. Ct. at 2600) and refrain from implying a judicially-implied damages remedy for aliens taken into custody pursuant to a Warrant of Removal under an immigration judge's order of removal.

**B.      The INA Expressly Deprives this Court of Subject Matter Jurisdiction to Entertain Kamburowski's *Bivens* Claims.**

Separate and apart from the fact that the Court should not imply a *Bivens* remedy in the face of the comprehensive remedial scheme that Congress enacted in the INA, the Court should dismiss Kamburowski's *Bivens* claims for lack of subject matter jurisdiction because 8 U.S.C. § 1252(g) expressly precludes the Court from entertaining such claims.

The statutory provision, as amended, reads as follows:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of an alien arising from the *decision or action* by the Attorney General to commence proceedings, adjudicate cases, or *execute removal orders* against any alien under this chapter.

8 U.S.C. § 1252(g) (as amended by section 105(a) of the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, § 106(a), 119 Stat. 231 (2005))(emphasis added).[10/]

The Supreme Court has held that this provision "applies . . . to three discrete actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999). In suing Kidd and Carbone in connection with their alleged actions in arresting and detaining him pursuant to a final order of removal and a warrant of removal, Kamburowski is challenging the decision or action to execute a removal order. As such, this Court is barred by statute from considering his complaint.

The Fifth Circuit's decision in *Foster v. Townsley*, 243 F.3d 210 (5th Cir. 2001), which involved facts astonishingly similar to the facts of this case, is directly on point. Foster was an alien whose removal was ordered *in absentia* by an immigration judge in New York after Foster and his attorney failed to appear for a scheduled hearing. 243 F.3d at 211. Foster subsequently filed a motion to reopen his proceedings, claiming that he had never received notice of the immigration hearing, and this motion was denied. While this decision was on appeal before the

---

[10/] Several other provisions of the INA also cast doubt on the Court's jurisdiction to consider Kamburowski's *Bivens* claims. For example, 8 U.S.C. § 1226(e) provides that "No court may set aside any action or decision by the Attorney General . . . regarding the detention or release of any alien . . . ." Similarly, 8 U.S.C. § 1231(a)(4)(D), which relates to the detention and removal of aliens subject to final orders of removal, provides that "No cause or claim may be asserted . . . against any official of the United States . . . to compel the release, removal, or consideration for release or removal of any alien."

BIA, Townsley, an INS deportation officer, arrested Foster and removed him to Jamaica. Subsequently, the BIA sustained Foster's appeal, finding that there was a lack of evidence that written notice had been sent to Foster's attorney by certified mail, as the INA required at that time. *Id*. After Foster returned to the United States, he filed a *Bivens* action against Townsley, seeking five million dollars in damages for alleged constitutional deprivations. *Id.* at 212. The district court dismissed the complaint for lack of jurisdiction under 8 U.S.C. § 1252(g), and the Fifth Circuit affirmed.

As the Fifth Circuit explained, regardless of whether the specific actions of the deportation officer can be characterized as discretionary or non-discretionary in nature, section 1252(g) bars judicial consideration of "any cause or claim" that "aris[es] from the decision or action by the government to execute a removal order. *Id*. at 212-14. Because "the particular acts that form the basis of Foster's lawsuit arise from the officials' decision to execute his removal order," his *Bivens* claims of false arrest, excessive force, and the like "are all directly connected to the execution of the deportation order. Therefore, their acts fall within the ambit of section 1252(g) and are precluded from judicial review." *Id*. at 214-15. *See also Duamutef v. INS*, 386 F.3d 172, 182-83 (2d Cir. 2004) (holding that 8 U.S.C. § 1252(g) precludes mandamus jurisdiction over claim seeking to compel the Attorney General to enforce removal order). As was the claim in *Foster*, Kamburowski's *Bivens* claim is barred by 8 U.S.C. § 1252(g) and, therefore, should be dismissed as beyond the scope of this Court's jurisdiction.[11/]

---

[11/]     Judge Trager recently rejected the government's argument that a *Bivens* suit was precluded by 8 U.S.C. § 1252(g). *See Arar v. Ashcroft*, 414 F. Supp.2d 250, 271 (E.D.N.Y. Feb. 16, 2005). Defendants respectfully disagree with the holding in *Arar*. Regardless, the instant case is distinguishable from *Arar* because Kamburowski, unlike Arar, does not present a "*bona fide* legal and constitutional question[] unrelated to the removal order" such that he escapes the language of § 1252(g). *Id*. He presents, at best, nothing more than a "mere challenge" to the Attorney General's "decision or action" to "execute" his
(continued...)

**III.**   **TO THE EXTENT THE AMENDED COMPLAINT PURPORTS TO ASSERT CLAIMS OF CONSTITUTIONAL TORT AGAINST KIDD AND CARBONE IN THEIR INDIVIDUAL CAPACITIES, IT MUST BE DISMISSED ON THE BASIS OF KIDD'S QUALIFIED IMMUNITY FROM SUIT AND CARBONE'S LACK OF PERSONAL INVOLVEMENT IN THE EVENTS ALLEGED IN THE COMPLAINT.**

Even assuming that this Court has jurisdiction to entertain Kamburowski's complaint and a lawful basis to imply a *Bivens* remedy under the facts of this case, it should dismiss the constitutional tort claims because (1) defendant Kidd is entitled to qualified immunity for taking actions that were objectively reasonable under the facts known to him at the time and that were authorized by federal statute and regulation, and (2) defendant Carbone was not personally involved in Kamburowski's arrest or detention, or in any of the events alleged in the complaint.

**A.**   **Kidd is Entitled To Qualified Immunity Because Kamburowski Has Failed to Adduce Evidence of a Constitutional Violation.**

Kamburowski challenges Kidd's decision to arrest and detain him at his adjustment of status interview, alleging vaguely that Kidd and others "intentionally conspired, confederated, and agreed to violate Plaintiff's rights, by illegally and unlawfully imprisoning [Kamburowski] from January 22 to February 22, 2004." Am. Compl. ¶ 39. However, as elaborated below, Kamburowski has failed to adduce any evidence that would create a triable issue of fact with regard to whether Kidd acted unreasonably or otherwise violated Kamburowski's Fourth Amendment rights,[12/] and this circumstance renders Kidd immune from suit.

---

[11/]   (...continued)
removal order. *Id.* (quoting 8 U.S.C. § 1252(g)).

[12/]   Kamburowski's substantive constitutional challenges to Kidd's decision to execute the removal order by arresting and detaining Kamburowski should be analyzed under the Fourth Amendment, rather than under the substantive component of the Fifth Amendment. As the Supreme Court has explained in an arrest and detention case, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more
(continued...)

Federal officers enjoy qualified immunity from individual capacity suits for actions undertaken in the course of their employment. The qualified immunity doctrine, enunciated in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), allows government officials such as Kidd to vigorously exercise their authority without the chill and distraction of damages suits, by ensuring that only conduct that unquestionably violates the Constitution will subject an official to personal liability. Qualified immunity shields government officials sued in their individual capacities from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. Defendants are entitled to immunity from suit even if plaintiffs' rights were violated, so long as those rights were not "clearly established" at the time of the incident or if reasonable officials in the defendants' position could disagree as to whether their conduct would violate plaintiffs' rights. *Mitchell v. Forsyth*, 472 U.S. 511, 535 & n.12 (1985). Qualified immunity thus provides "'ample room for mistaken judgments' by protecting "'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (*per curiam*) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). The protection of qualified immunity is lost only where "[t]he contours of the [right alleged to have been violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

---

<span>12/</span>    (...continued)

generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). *See also United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (a constitutional claim "covered by a specific constitutional provision" should be analyzed under the specific provision, rather than under the due process clause); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1069 (9th Cir. 2004) (applying *Albright*); *Picray v. Sealock*, 138 F.3d 767, 770 (9th Cir. 1998) ("the validity of an arrest must be analyzed under Fourth Amendment standards, not due process standards").

The first step in determining whether an official has violated a "clearly established" right is to inquire whether plaintiff has shown the violation of a constitutional right at all, regardless of whether that right is clearly established or not. *See Saucier v. Katz*, 533 U.S. 194 (2001). The test of government action under the Fourth Amendment is one of objective reasonableness under all the circumstances: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The inquiry into objective reasonableness balances the Fourth Amendment interests of the individual against the countervailing interests of the government. *See id.*

Because an arrest that is made with probable cause is *per se* reasonable under the Fourth Amendment, the analysis of whether Kamburowski has adduced evidence sufficient to overcome Kidd's qualified immunity with regard to a claim of a Fourth Amendment violation is essentially the same as the analysis of whether he can sustain a claim against the United States for the common law torts of false arrest and false imprisonment. As elaborated above, at pages 15 to 21, Kamburowski can prove no set of facts that would establish that Kidd failed to act reasonably in arresting Kamburowski. For one thing, federal law authorized—indeed required—Kamburowski's arrest and detention as of January 22, 2004. *See* 8 U.S.C. § 1231(a)(2) ("the Attorney General *shall* detain" any alien who has been ordered removed. 8 U.S.C. § 1231(a)(2)); 8 C.F.R. § 241.3 (once an immigration court issues a final order of removal with respect to an alien, that alien, if in the United States, "*will be taken into custody* pursuant to the warrant of removal."). "When a public official acts in reliance on a duly enacted statute or ordinance, that official ordinarily is entitled to qualified immunity." *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999), *cert. denied*, 530 U.S. 1261 (2000). That is to

say, once the immigration judge in Arlington entered a final order of removal against Kamburowski on May 31, 2001, and until that order was vacated by an immigration judge on July 16, 2004, Kamburowski's arrest by federal immigration officers, and his detention pending physical removal from the country, were mandated by federal law and presumptively reasonable, and therefore cannot be said to violate Kamburowski's Fourth Amendment rights.

Moreover, because the Fourth Amendment reasonableness inquiry is objective, the constitutional balance weighs all of the facts and circumstances known to Kidd when he arrested Kamburowski, regardless of any indications of his subjective intent. As the Supreme Court has explained, "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent" of the individuals acting on the government's behalf. *Whren v. United States*, 517 U.S. 806, 814 (1996). Thus, "the subjective motivations of the individual officers . . . have no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment." *Graham*, at 490 U.S. at 398. Rather, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant" to the inquiry into whether a seizure is objectively reasonable. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

Here, based on all of the facts known to him at that time, Kidd had no reasonable basis to question the validity of the Warrant of Removal/Deportation or the final order of removal. Undisputed Facts ¶ 84. Before he even proceeded to Garden City, Kidd verified in a law enforcement database that Kamburowski had been ordered to leave the country but had failed to comply with the order of removal; he also confirmed that there were no pending motions or appeals in Kamburowski's case, and that a final order of removal had been issued. Undisputed Facts ¶¶ 72-73. Upon arriving at Garden City, Kidd personally examined Kamburowski's immigration file and found both a signed removal order issued by an

immigration judge and a signed warrant of deportation. Undisputed Facts ¶¶ 75-77. The final order of removal, dated May 31, 2001, and signed by Immigration Judge John Milo Bryant in Arlington, Virginia, noted that Kamburowski had abandoned any and all claims for relief from removal and directed that he be removed forthwith from the United States to Australia. Undisputed Facts ¶ 81. By examining the contents of the file, Kidd was able to confirm that it was a valid final order of removal. Undisputed Facts ¶ 82.

Meanwhile, the Warrant of Removal/Deportation (Form I-205), signed by the INS District Director in Arlington, Virginia, on August 1, 2001, notified "any officer of the United States Immigration and Naturalization Service" that Kamburowski is subject to removal/deportation from the United States, based upon a final order by an immigration judge in exclusion, deportation, or removal proceedings, and commands said officers "to take into custody and remove from the United States the above-named alien, pursuant to law." Undisputed Facts ¶ 78. A signed Warrant of Removal/Deportation remains valid indefinitely and authorizes a deportation officer immediately to arrest and deport the named subject of the warrant, regardless of any other considerations. Undisputed Facts ¶ 79. Given the presence in the file of the signed warrant and the immigration judge's signed final order of removal, there was ample probable cause for Kidd to arrest Kamburowski, Undisputed Facts ¶ 85, and there is no objective basis for a finding of a Fourth Amendment violation.

Under these circumstances, Kamburowski can prove no set of facts that would show a violation of "clearly established statutory or constitutional rights of which a reasonable person would have known." *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996). There is not a scintilla of evidence in this case that Kidd was in any way incompetent or bent upon breaking the law. On the contrary, he simply carried out his obligation to diligently enforce the immigration laws.

For this reason, he is entitled to qualified immunity, and Kamburowski's *Bivens* claims against

him must be dismissed.

>    **B.    The Bivens Claims Against Carbone Must Be Dismissed, Because There
>    is No Allegation, Much Less Evidence, that he was Personally Involved
>    in Any Way in Kamburowski's Arrest or Subsequent Detention.**

In addition to suing Kidd, plaintiffs have named as a defendant in this case John

Carbone, identified in the caption as "Acting Field Director, U.S. Immigration & Customs

Enforcement." However, the only reference to Carbone in the body of the Amended Complaint

is in paragraph 5, which alleges as follows:

> Defendant John Carbone is the Acting Field Director for the New York
> District of the U.S. Immigration & Customs Enforcement ("USICE"), and
> is sued in his individual capacity. Defendant Carbone has established and
> implemented policies for the unlawful and unconstitutional arrest and
> imprisonment of aliens, and has ordered and ratified the unlawful and
> unconstitutional arrest and imprisonment of Plaintiff Michael
> Kamburowski.

Am. Compl. ¶ 5. There are no other references to Carbone in the complaint, which does not

specify the manner in which Carbone is alleged to have been involved in the decision to arrest

or detain Kamburowski. Nor did plaintiffs depose Carbone or adduce any evidence in discovery

in this case of Carbone's personal involvement in Kamburowski's arrest or in the events and

actions germane to this case. Indeed, the complaint itself alleges that it was "an unknown

Supervisory Deportation Officer," referred to in the complaint as "John Doe II," who

"improperly ordered the immediate arrest of Plaintiff Michael Kamburowski." Am. Compl. ¶ 11.

It is undisputed that, while Carbone did serve at some point in time as Acting Field

Director for ICE's New York Field Office, he did not serve in that capacity as of January 22,

2004, the date on which Kidd arrested Kamburowski. Undisputed Facts ¶ 143.[13/] Moreover, as

of January 2004 the position of Field Director, or Acting Field Director, was at least four levels

above Kidd in the supervisory chain of command within ICE's New York Field Office.  The

incumbent in that position would have been in charge of the entire deportation and removal

program for the New York District. Undisputed Facts ¶ 144.  There is no evidence that Kidd had

any conversations with Carbone, or with any Field Director or Acting Field Director, either on

January 22, 2004, or on any other date, about Kamburowski or about the basis for or

circumstances surrounding his arrest. Undisputed Facts ¶ 145.  It is undisputed that neither

Carbone nor any Field Director or Acting Field Director was ever involved in any way in either

the decision to arrest Kamburowski or in the actual arrest or processing of Kamburowski.

Undisputed Facts ¶ 146.

Under these circumstances, the Court is obliged to dismiss the *Bivens* claims against

Carbone.  It is well established that liability only lies upon a defendant who personally subjects,

or causes to be subjected, any person to the deprivation of a federal right.   Thus, for a

constitutional tort claim to survive summary judgment, plaintiffs must adduce evidence that

each individual defendant was personally involved in the deprivation of a constitutional right.

*Barbera v. Smith*, 836 F.2d 96, 99 (2d Cir. 1987), *cert. denied*, 489 U.S. 1065 (1989).  Conclusory

allegations in the complaint are not sufficient:  "[D]iffuse and expansive allegations are

insufficient unless amplified by specific instances of misconduct."  *Ostrer v. Aronwald*, 567 F.2d

551, 553 (2d Cir. 1977).  Rather, a plaintiff must show through admissible evidence sufficient

to survive summary judgment that each defendant either participated in or personally authorized

---

[13/]     Carbone is not currently the Acting Field Director for ICE.  He retired from ICE at least two years ago and no longer works for the agency. Undisputed Facts ¶ 142.

wrongful actions attributed to other officers. *See Robinson v. Via*, 821 F.2d 913, 923 (2d Cir. 1987); *Satler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986).

When individual defendants are not shown to have personally committed or cooperated in a wrongful act, they cannot be held liable for it. *See Gill v. Mooney*, 824 F.2d 192 (2d Cir. 1987) (absent personal involvement in allegedly unlawful conduct of subordinates, there can be no liability); *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (plaintiff must show defendants participated directly or were somehow involved in actions alleged to have caused the deprivation); *see also Alsaifullah v. Travis*, 160 F. Supp. 2d 417, 420 (E.D.N.Y. 2001).

Given the undisputed evidence in the summary judgment record demonstrating Carbone's complete lack of involvement in Kamburowski's arrest or in any of the actions or events alleged in the complaint, Carbone is entitled to summary judgment, and the *Bivens* claims against him must be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the complaint for lack of subject matter jurisdiction and on account of the defendants' immunity from suit. In the alternative, it should grant the defendants summary judgment dismissing the complaint with prejudice.

Dated:  Brooklyn, New York
       November 2, 2007

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201-2776

By:    /s/ {FILED ELECTRONICALLY}
       F. FRANKLIN AMANAT (FA6117)[14]
       Assistant United States Attorney
       (718) 254-6024

---

[14]    The United States Attorney's Office would like to thank David Zubkis, a third-year law student at Brooklyn Law School and an intern with this Office, for his invaluable assistance in the drafting and preparation of this Memorandum.