**UNITED STATES DISTRICT COURT**                        **FA6117**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Michael KAMBUROWSKI *et ux.*, | ) |
| | ) |
| *Plaintiff*, | )   No. 05-CV-0953 (CBA/RLM) |
| *v.* | ) |
| | )   (Amon, J.) |
| Michael KIDD, Deportation Officer, U.S. | )   (Mann, M.J.) |
| Immigration and Customs Enforcement, *et* | ) |
| *al.*, | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

## DECLARATION OF MICHAEL S. KIDD

      I, Michael S. Kidd, pursuant to 28 U.S.C. § 1746, do hereby declare under the penalties and pains of perjury, as follows:

      1.     I have been an employee of the former Immigration and Naturalization Service ("INS") and its successor agency, the Immigration and Customs Enforcement ("ICE") component of the Department of Homeland Security, from July 1996 to the present. From December 2002 until May 2007 (and therefore during all times relevant to this case), I held the position of Deportation Officer in the Fugitive Operations Team of ICE. During that time, I was assigned to the New York District of ICE at 26 Federal Plaza, Manhattan, and was supervised by Cyril Lopez. In May of this year I was promoted to Supervisory Deportation Officer with the Fugitive Operations Team, and in July of this year I was transferred to the Nassau/Suffolk Criminal Alien Program as a Supervisory Deportation Officer.

      2.     My first position with the INS was as an immigration inspector, a position I held from July 1996 through approximately October 1999. I went on to hold the position of District

Dockets.Justia.com

Adjudications Officer from October 1999 through July of 2002. From July through December of 2002, I was a Deportation Officer, but had not yet been assigned to a specific division.

3.    As a Deportation Officer in the Fugitive Operations Team, I was responsible for locating and apprehending aliens who had been ordered to leave the United States but had failed to do so, whether they were criminal aliens or non-criminal aliens. In the course of working in the Fugitive Operations Team, I received specific training in the use of a number of law enforcement databases, as well as fugitive tracking methods, arrest techniques, and the use of various weapons. I have also received specialized training in immigration law and in the policies and procedures of the various immigration agencies, including the immigration courts and the Board of Immigration Appeals.

4.    I am a defendant in the above-captioned action. Plaintiff Michael R. Kamburowski, No. A76-595-582, has sued me and other defendants in connection with events alleged to have taken place on January 22, 2004. Specifically, he alleges that on that date, when I arrested him on the basis of an outstanding absconder warrant, I committed false arrest and false imprisonment and violated his constitutional rights. I vehemently deny Kamburowski's allegations and respectfully submit this Declaration in support of my motion to dismiss his complaint or, in the alternative, for summary judgment.

5.    In my capacity as a Deportation Officer, I have access to and have reviewed Kamburowski's complete immigration file, including his immigration court file. Additionally, I have both training and experience in understanding and interpreting the full range of documents found in Kamburowski's immigration file, including printouts from government databases and forms completed by aliens and their sponsors. On this basis, I am thoroughly familiar with the contents of Kamburowski's immigration file and with the entirety of his

immigration status and proceedings. This Declaration is based on my review of his immigration file, on my personal recollections of the events of January 22, 2004, and on other information personally known to me by virtue of my handling of Kamburowski's arrest.

6. A complete and true and correct copy of Kamburowski's immigration file, including his deportation file and the record of proceedings before the immigration court, has been consecutively paginated (pages 1-149) and is annexed to this Declaration as Exhibit 1. References to page numbers throughout this Declaration are to the pages of the immigration file.

**Kamburowski's Arrival in the United States**

7. Kamburowski's immigration file indicates that he is a citizen of the Commonwealth of Australia. He was admitted to the United States at Los Angeles, California, on January 23, 1995, as a nonimmigrant visitor for pleasure on a six-month B-2 visa that entitled him to remain in the United States only through July 22, 1995. Exh. 1, at 36, 146, 147.

8. Kamburowski did not depart the United States by July 22, 1995, as he was required to do under the terms of his visa, but illegally remained in the United States beyond that date without authorization from the INS, in violation of section 237(a)(1)(B) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(1)(B) (1994). Exh. 1, at 36.

9. Kamburowski's B-2 visa did not entitle him to work for compensation in the United States, and Kamburowski had no other authorization from the INS or any other federal agency to seek or to obtain employment in this country. Nevertheless, beginning in May 1995 he was employed for wages or other compensation at Americans for Tax Reform. In so doing, he was in violation of section 237(a)(1)(C)(I) of the INA, 8 U.S.C. § 1227(a)(1)(C)(I) (1994),

in that he failed to maintain or comply with the conditions of nonimmigrant status under which he was admitted to the United States. Exh. 1, at 36.

**Kamburowski's First Marriage and First Adjustment Application**

10. On February 7, 1997, Kamburowski married Terri Lynn Sweat, a U.S. Citizen, in Alexandria, Virginia. Exh. 1, at 52.

11. According to the Final Decree of Divorce entered on April 9, 1998, in the Circuit Court for the City of Alexandria (a copy of which was submitted with Kamburowski's 2002 adjustment application and is included in Kamburowski's immigration file), Kamburowski and Sweat separated on or about April 1, 1997 (i.e., less than two months after their marriage), and after that date they lived separate and apart, without any cohabitation and without interruption. On November 12, 1997, Kamburowski and Sweat entered into a legal separation agreement. Exh. 1, at 7.

12. On November 25, 1997, Kamburowski and Sweat, through counsel, submitted a number of immigration forms to the INS, including a Petition for Alien Relative (Form I-130) (Exh. 1, at 45, 117-19), Biographical Information forms (Form G-325A) (Exh. 1, at 50-51, 124-25), an Application to Register Permanent Residence or Adjust Status (Form I-485) (Exh. 1, at 41-44, 120-123), an Employment Authorization Form (Form I-765) (Exh. 1, at 128), and an Affidavit of Support (Form I-134) (Exh. 1, at 126-27).

13. The purpose of these forms was to adjust Kamburowski's status from an alien unlawfully in the United States as a nonimmigrant overstay to a lawful permanent resident alien. Even though Kamburowski and Sweat had legally separated two weeks before these forms were submitted to the INS, and even though the couple had not cohabited for almost eight months

(Exh. 1, at 7), Sweat was purporting to sponsor Kamburowski's application for permanent residence in the United States. Exh. 1, at 45, 117-19.

14.    Kamburowski signed the Application to Register Permanent Residence or Adjust Status (Form I-485) on September 29, 1997, but the form was not paid for or submitted to the INS until November 25, 1997. The address listed on the I-485 was "c/o Paul Sherman Allen and Associates, 1329 18th Street, N.W. Washington D.C., 20036." The I-485 indicated that Kamburowski's visa status as of September 29, 1997, was "B-2 expired." Exh. 1, at 41-44, 120-23.

15.    Kamburowski signed his Biographical Information form (Form G-325A) on September 22, 1997, and his Application for Employment Authorization (Form I-765) on September 23, 1997, but he did not pay for or submit either form until November 25, 1997. Both of these forms listed his address as of the date of filing as 2001 N. Adams St., Apt. 416, Arlington, VA 22201. Exh. 1, at 51, 125, 128.

16.    Sweat signed the Petition for Alien Relative (Form I-130) on September 22, 1997, but the form was not paid for or submitted to the INS until November 25, 1997. In line 20 of the I-130, Sweat certified under the penalty and pains of perjury that as of September 22, 1997, she and Kamburowski were residing together at 2001 N. Adams St., Apt. 416, Arlington, VA 22201. Exh. 1, at 45, 117-19.

17.    Sweat signed her Biographical Information form (G-325A) on September 23, 1997, but that form was also not paid for or submitted until November 25, 1997. Exh. 1, at 50, 124. Sweat signed the Affidavit of Support (Form I-134) on September 29, 1997, and that form was also not submitted until November 25, 1997. Exh. 1, at 126-27. In both of these

documents, Sweat stated, under oath, that Kamburowski's address as of the date of filing was 2001 N. Adams St., Apt. 416, Arlington, VA 22201.

18.    On April 9, 1998, the Circuit Court for the City of Alexandria entered a Final Decree of Divorce dissolving the marriage of Kamburowski and Sweat.  Kamburowski did not inform the INS of this divorce until he filed a second I-130 in 2002.   Exh. 1, at 7.

19.    Virtually every alien in the United States is under an affirmative obligation to report address changes to the INS (now, ICE), regardless of immigration status or circumstances, pursuant to the registration requirements of the INA.   Specifically, all aliens who remain in the United States for more than 30 days have a duty to register with the immigration authorities, unless they have been expressly exempted from the requirement (which Kamburowski was not), and, if registered, have a duty to keep the immigration authorities apprised of any address changes.  8 U.S.C. §§ 1302, 1305(a), 1306(b).  Aliens subject to these registration requirements must report their change of address to the immigration authorities on a Change of Address Card (Form I-697A).

20.    Kamburowski's immigration file does not contain any Change of Address Cards (Forms I-697A) submitted to INS after November 25, 1997, informing the INS that his address was anything other than 2001 N. Adams St., Apt. 416, Arlington, VA 22201.  As noted above, in numerous documents Kamburowski and Sweat submitted to INS on November 25, 1997, Kamburowski and/or Sweat swore under the penalties of perjury that their address was 2001 N. Adams St., Apt. 416, Arlington, VA 22201.

21.    On December 2, 1998, the INS Office in Arlington, Virginia, sent a letter to Kamburowski at 2001 N. Adams St., Apt. 416, Arlington, VA 22201.  A copy of this letter was also sent to Kamburowski's counsel of record, Paul Shearman Allen.   Exh. 1, at 39.   The

immigration file contains no indication that this letter did not reach Kamburowski or his counsel, or that the Postal Service returned the mail as undeliverable.

22.     The letter of December 2, 1998, directed Kamburowski to appear before an INS examiner on January 4, 1999, at 11:00 a.m., for an interview in connection with the Application for Adjustment of Status.  The letter directed Kamburowski to bring to the interview, among other things, his spouse, evidence of common residence and shared life, and a current letter of employment. Exh. 1, at 39.

23.     Kamburowski did not show up for his scheduled interview on January 4, 1999, nor is there any indication in the file that he or his counsel contacted INS in advance of the scheduled interview to inform INS that he would not be attending the interview or to explain his absence.  Exh. 1, at 8.

24.     On April 21, 1999, the INS Office in Arlington, Virginia, sent a second letter to Kamburowski at 2001 N. Adams St., Apt. 416, Arlington, VA 22201.  A copy of this letter was also sent to Kamburowski's counsel of record, Paul Shearman Allen.    Exh. 1, at 38.  The immigration file contains no indication that this letter did not reach Kamburowski or his counsel, or that the Postal Service returned the mail as undeliverable.

25.     The letter of April 21, 1999, directed Kamburowski to appear before an INS examiner on May 25, 1999, at 3:00 p.m., for an interview in connection with the Application for Adjustment of Status.  The letter directed Kamburowski to bring to the interview, among other things, his spouse, evidence of common residence and shared life, and a current letter of employment.  Exh. 1, at 38.

26.     Kamburowski did not show up for his scheduled interview on May 25, 1999, nor is there any indication in the file that he or his counsel contacted INS in advance of the

scheduled interview to inform INS that he would not be attending the interview or to explain his absence. Exh. 1, at 8.

27. On December 17, 1999, the INS District Director in Arlington, Virginia, issued a Decision on Application for Status as Permanent Residence (Form I-291). The decision orders that the application for status as a permanent resident be denied for the following reasons:

> On two occasions you have failed to appear for scheduled interviews (January 4, 1999 and May 25, 1999) regarding your application for status as a lawful permanent resident. Because you have failed to appear for an interview and have not provided valid explanations for your absences, your application must be dismissed for lack of prosecution.

The Decision informed Kamburowski that his employment authorization was automatically revoked as of December 17, 1999, and that he had until January 17, 2000, to effect his departure from the United States voluntarily, without the institution of proceedings to enforce his departure. Kamburowski was advised that if he failed to depart from the United States by the date specified, proceedings will be instituted to enforce his departure. Exh. 1, at 8.

28. The Decision on Application for Status as Permanent Residence (Form I-291) was sent to 2001 N. Adams St., Apt. 416, Arlington, VA 22201. The immigration file contains no indication that this letter did not reach Kamburowski, or that the Postal Service returned the mail as undeliverable. Exh. 1, at 8.

**Kamburowski's Removal Proceedings**

29. On December 5, 2000, the INS Office in Arlington, Virginia, issued a Notice to Appear (Form I-862) charging Kamburowski with being removable from the United States on two grounds. First, Kamburowski was charged with having overstayed his nonimmigrant visa,

in violation of 8 U.S.C. § 1227(a)(1)(B) (1994). Second, Kamburowski was charged with failing

to maintain or comply with the conditions of the nonimmigrant status under which he was

admitted, in violation of 8 U.S.C. § 1227(a)(1)(C)(I) (1994), in that he was employed for wages

or other compensation without authorization of the INS. Exh. 1, at 36-37.

30.     The Notice to Appear was filed with the immigration court in Arlington, Virginia,

and was served on Kamburowski by regular mail to 2001 N. Adams St., Apt. 416, Arlington, VA

22201. The immigration file contains no indication that the Notice to Appear did not reach

Kamburowski, or that the Postal Service returned the mail as undeliverable, either to the INS

or to the immigration court located at 901 N. Stuart St., Apt. 1300, Arlington, VA 22203. Exh.

1, at 37.

31.     On January 8, 2001, the immigration court in Arlington, Virginia, generated an

automated Notice of Hearing in Removal Proceedings, directing Kamburowski to appear before

an immigration judge on February 22, 2001, to answer the charges of the Notice to Appear.

Exh. 1, at 35. The Notice of Hearing contained the following warning:

> Failure to appear at your hearing except for exceptional
> circumstances may result in one or more of the following actions:
> (1) You may be taken into custody by the Immigration and
> Naturalization Service and held for further action. OR (2) Your
> hearing may be held in your absence under section 240(b)(5) of
> the Immigration and Nationality Act. An order of removal will be
> entered against you if the Immigration and Naturalization Service
> established by clear, unequivocal, and convincing evidence that a)
> you or your attorney has been provided this notice and b) you are
> removable.

32.     The Notice of Hearing was served on Kamburowski by regular mail to 2001 N.

Adams St., Apt. 416, Arlington, VA 22201. The immigration file contains no indication that

the Notice to Appear did not reach Kamburowski, or that the Postal Service returned the mail as undeliverable, either to the INS or to the immigration court in Arlington.  Exh. 1, at 35.

33.    The Notice of Hearing contains the following paragraph:

> IF YOUR ADDRESS IS NOT LISTED ON THE NOTICE TO APPEAR, OR IF IT IS NOT CORRECT, WITHIN FIVE DAYS OF THIS NOTICE YOU MUST PROVIDE TO THE IMMIGRATION COURT ARLINGTON, VA THE ATTACHED FORM EOIR-33 WITH YOUR ADDRESS AND/OR TELEPHONE NUMBER AT WHICH YOU CAN BE CONTACTED REGARDING THESE PROCEEDINGS. EVERYTIME YOU CHANGE YOUR ADDRESS AND/OR TELEPHONE NUMBER, YOU MUST INFORM THE COURT OF YOUR NEW ADDRESS AND/OR TELEPHONE NUMBER WITHIN 5 DAYS OF THE CHANGE ON THE ATTACHED FORM EOIR-33. . . .  CORRESPONDENCE FROM THE COURT, INCLUDING HEARING NOTICES, WILL BE SENT TO THE MOST RECENT ADDRESS YOU HAVE PROVIDED, AND WILL BE CONSIDERED SUFFICIENT NOTICE TO YOU, AND THESE PROCEEDINGS CAN GO FORWARD IN YOUR ABSENCE.

Exh. 1, at 35 (all caps in original).

34.    The immigration file contains no record that Kamburowski ever filed an EOIR-33 form with the immigration court in Arlington, Virginia, notifying that court of any change in address.

35.    Kamburowski did not appear before the immigration court on February 22, 2001, as he had been directed to do by the Notice of Hearing.

36.    On February 26, 2001, the immigration court in Arlington, Virginia, generated a second automated Notice of Hearing in Removal Proceedings, this time directing Kamburowski to appear before an immigration judge on May 31, 2001, to answer the charges of the Notice to Appear.  The Notice of Hearing contained the same warnings and instructions with regard to change of address that had been contained in the first Notice of Hearing.  Exh. 1, at 142.

37.    The second Notice of Hearing was served on Kamburowski by regular mail to 3202 North Pershing Drive, Arlington, VA 22201. Exh. 1, at 142. On information and belief, this is the address Kamburowski had declared on his Form I-94, at the time of his arrival in this country in 1995, as the address in the United States at which he intended to reside.   It is also listed on Kamburowski's Biographic Information form (Form G-325A) as the first address at which he resided after arriving in the United States.  The immigration file contains no indication that the Notice to Appear did not reach Kamburowski, or that the Postal Service returned the mail as undeliverable, either to the INS or to the immigration court in Arlington.  Exh. 1, at 35.

38.    Kamburowski did not appear before the immigration court on May 31, 2001, as he had been directed to do by the Notice of Hearing.  As a result, on that date Immigration Judge John Milo Bryant issued an order *in absentia* finding that Kamburowski had abandoned any and all claims for relief from removal and directing that he be removed form the United States to Australia.  Exh. 1, at 139.

39.    The order of removal was served on Kamburowski on June 5, 2001, by regular mail to 3202 North Pershing Drive, Arlington, VA 22201.  Exh. 1, at 140.  The immigration file contains no indication that the order of removal did not reach Kamburowski, or that the Postal Service returned the mail as undeliverable, either to the INS or to the immigration court in Arlington.

40.    On August 1, 2001, the INS District Director in Arlington signed a Warrant of Removal/Deportation (Form I-205) notifying "any officer of the United States Immigration and Naturalization Service" that Kamburowski is subject to removal/deportation from the United States, based upon a final order by an immigration judge in exclusion, deportation, or removal

proceedings. The warrant commands said officers "to take into custody and remove from the United States the above-named alien, pursuant to law." Exh. 1, at 25.

41. On August 2, 2001, the INS District Director in Arlington issued a "bag and baggage" letter, or Notice to Surrender (Form I-166), to Kamburowski, directing him to report to the INS Office in Arlington with his baggage, completely ready for deportation. Exh. 1, at 30.

42. The bag and baggage letter was mailed to Kamburowski at 3202 North Pershing Drive, Arlington, VA 22201.

43. The immigration file contains one envelope that the Postal Service returned to the INS with the notation "moved left no address." Exh. 1, at 28. It is not entirely clear what document or documents may have been contained in this envelope, which is stamped with dates of September 6, 2001, August 14, 2001, August 7, 2001, and one other date that is illegible. This is the only document in the immigration file for which there is any indication of non-delivery.

**Kamburowski's Second Marriage and Second Adjustment Application**

44. The immigration file reflects that on or about June 14, 2001, Kamburowski married again, this time to Gina Jessica Smith. Exh. 1, at 98.

45. On or about May 31, 2002, Kamburowski and Smith, through counsel, submitted a number of immigration forms to the INS, including a Petition for Alien Relative (Form I-130) (Exh. 1, at 89-90), Biographical Information forms (Form G-325A) (Exh. 1, at 100-01), an Application to Register Permanent Residence or Adjust Status (Form I-485) (Exh. 1, at 102-03),

an Employment Authorization Form (Form I-765) (Exh. 1, at 112), and an Affidavit of Support (Form I-134) (Exh. 1, at 108-11).

46. The purpose of these forms was to adjust Kamburowski's status from an alien who was unlawfully in the United States to a lawful permanent resident alien.

47. Kamburowski's address on all of these forms was listed as 11-15 St. Nicholas Avenue, Apt. 5H, New York, NY 10026. Exh. 1, at 89-90, 100-03, 108-12. There is no indication in the file that Kamburowski had ever previously provided this address to the INS.

**The Basis for Kamburowski's Arrest**

48. On January 22, 2004, at approximately 8:00 a.m., I received a call on my cell phone from Valeri F. Auletta, a District Adjudication Officer ("DAO") with U.S. Citizenship and Immigration Services ("CIS") in Garden City, New York. At that time, I was in Brooklyn conducting surveillance with my regular partner, Immigration and Customs Enforcement Agent Luis Tituana.

49. Auletta informed me that she was meeting at the CIS Office in Garden City with an applicant for adjustment of status. She had run a mandated background check on the applicant in IBIS, a law enforcement database, which revealed that the applicant was an alien absconder who had an outstanding warrant of deportation and a final order of removal. Exh. 1, at 11.

50. Upon information and belief, Auletta called me because the Garden City CIS office did not have any deportation officers or detention facilities on-site, because she had clear and convincing evidence that the applicant was a fugitive, and because I am assigned to the Fugitive Operations team of ICE. She had referred a handful of cases to me in the past and knew me by virtue of these previous referrals.

51.     I do not recall whether Auletta initially provided me with the fugitive's name, but I do know that she provided me with his alien number (A76 595 582).  Additionally, she told me that he was from Australia, and that there was no indication in the file that he had any criminal history.  I informed DAO Auletta that I would call my office, would run the alien's A-number against ICE's own databases, and would call her back to inform her whether I would be arriving at Garden City to take the fugitive into custody.

52.     Shortly thereafter, I called my office and asked my supervisor, Cyril Lopez, to run the fugitive's A-number against the DACS database.  DACS, or "Deportable Alien Control System," is an internal database that ICE uses in connection with its law enforcement and immigration enforcement missions.

53.     Approximately five to ten minutes later, Lopez called to inform me that DACS confirmed that Kamburowski had been ordered to leave the country but had failed to comply with the order of removal.  According to Lopez, there were no pending motions or appeals in Kamburowski's case, and a final order of removal had been issued.

54.     Lopez instructed me that apprehending the fugitive alien at Garden City was to take priority over my other assignments, and he ordered me and Tituana to cut short whatever we were doing at that time and to head to Garden City immediately.  Tituana and I proceeded directly to the Garden City CIS office.

55.     Upon our arrival at the Garden City CIS office, Tituana and I were met by Auletta, who handed me Kamburowski's immigration file.  I proceeded to review the file, either in the hallway outside Auletta's office or in Auletta's office itself (I do not precisely recall which).  During my review of the file, Auletta, Tituana, and, at one point, Supervising DAO Dennis Bunce were all present.

56.     In accordance with standard practice in the ICE Fugitive Operations Team, there are two primary documents I look for when reviewing a fugitive alien's immigration file: a signed warrant of deportation and a signed removal order issued by an immigration judge.

57.     In reviewing Kamburowski's file, I found a Warrant of Removal/Deportation (Form I-205), signed by the INS District Director in Arlington, Virginia, on August 1, 2001. Exh. 1, at 25. The warrant notified "any officer of the United States Immigration and Naturalization Service" that Kamburowski is subject to removal/deportation from the United States, based upon a final order by an immigration judge in exclusion, deportation, or removal proceedings, and commands said officers "to take into custody and remove from the United States the above-named alien, pursuant to law." Exh. 1, at 25.

58.     I am very familiar with Warrants of Removal/Deportation (Form I-205), as they are a type of document with which I worked on a daily basis while I was assigned to the Fugitive Operations Team.  Also, as noted above, I have received specialized training in immigration law and in the policies and procedures of the various immigration agencies, including the immigration courts and the Board of Immigration Appeals.  A signed Warrant of Removal/Deportation remains valid indefinitely and authorizes a deportation officer immediately to arrest and deport the named subject of the warrant, regardless of any other considerations. The existence of the signed warrant in itself confirms the existence of probable cause to make the arrest, and it is neither necessary nor appropriate for a deportation officer to seek independent verification of the basis for a Warrant of Removal/Deportation by calling the district from which it was issued.

59.     In reviewing Kamburowski's file, I also found a final order of removal, dated May 31, 2001, and signed by Immigration Judge John Milo Bryant in Arlington, Virginia, finding that

Kamburowski had abandoned any and all claims for relief from removal and directing that he be removed form the United States to Australia. Exh. 1, at 139. I was aware that the final order of removal had been entered *in absentia*, as it stated that Kamburowski had failed to appear at his deportation hearing. By examining the contents of the file, I was able to confirm that it was a valid final order of removal.

60.     Based on the facts known to me at that time, I had no reasonable basis to question the validity of the Warrant of Removal/Deportation or the final order of removal.

61.     Given the presence in the file of the signed Warrant of Removal/Deportation and the immigration judge's signed final order of removal, there was ample probable cause to arrest Kamburowski, and I did not need any additional authorization, approval, or information to arrest him. I did not have the authority NOT to arrest Kamburowski, or to defer arrest or inspection of Kamburowski to a later date. Thus, after having thoroughly reviewed the file, I decided to arrest Kamburowski.

## Facts Surrounding Kamburowski's Arrest

62.     Kamburowski, his wife, and his attorney were waiting in Auletta's office when Tituana and I entered the room to make the arrest. Upon entering the office, I identified myself as a Deportation Officer and displayed my credentials. I explained that Kamburowski had a final order of removal issued against him and was the subject of an outstanding Warrant of Removal/Deportation. I then displayed the immigration judge's order of removal and informed Kamburowski that I would be placing him under arrest.

63.     At all relevant times, and to the best of my recollection, I was not wearing a uniform but was dressed in street clothes. (I normally do not wear a uniform in fulfilling my

functions as a Deportation Officer.)  Although I was armed at the time of the arrest, at no time during my encounter with Kamburowski did I draw or display my service weapon.

64.    Prior to Kamburowski's arrest, Kamburowski and his attorney, Michael P. DiRaimondo, denied knowledge that Kamburowski had been ordered deported in Arlington. After learning that Kamburowski was going to be arrested, DiRaimondo grabbed Kamburowski's Australian passport from the table and refused to thereafter surrender it.  Upon information and belief, the purpose of this action was to delay Kamburowski's deportation because INS has to obtain travel documents before an alien can be deported.  Exh. 1, at 11.

65.    DiRaimondo asked for an opportunity to review Kamburowski's immigration file. Specifically, he asked for a copy of the Notice to Appear  Exh. 1, at 36-37. and of the immigration judge's final order of removal  Exh. 1, at 34.

66.    I do not recall giving Kamburowski's immigration file to DiRaimondo or to Kamburowski at any time or ever allowing either of them to physically handle it.  However, I did accede to counsel's request to review the Notice to Appear and the final order of removal, and he reviewed those documents in my presence.

67.    DiRaimondo asserted that the address on the Notice to Appear was not Kamburowski's correct address at the date that the Notice to Appear had been sent.  However, while this circumstance may be relevant in the context of a motion to reopen filed with an immigration judge or an appeal before the BIA, there was no indication in the file that such a motion or appeal was pending or had ever been filed.  In the presence of a signed final order of removal and a signed Warrant of Removal/Deportation, the alleged circumstance regarding the address on the Notice to Appear (even if true) is simply irrelevant to the decision whether to execute the removal order and arrest the fugitive alien.  In any event, I do not recall seeing

anything in the file suggesting that the Notice to Appear had been returned to the INS as undeliverable or improperly addressed.

68. Glancing at the file while I was holding it, DiRaimondo drew my attention to an envelope in the file that he said looked like it had been returned to INS. As far as I was aware, the envelope did not contain any documents at that time, and I was not aware of what if any documents the envelope had contained in the past. I did not look through the file to see what documents had been returned because it was not relevant to my decision to execute the removal order and arrest the alien absconder.

69. DiRaimondo also asked me if the file contained a notice to surrender, or "bag and baggage" letter (Form I-166). I do not recall looking through the file specifically for a notice to surrender at the time of the arrest. Although I am now aware that the file does contain such a notice, I do not recall seeing this document on the date of the arrest. Exh. 1, at 30. However, upon information and belief, a Notice to Surrender is not an important component of an immigration file because the INS is not obligated to provide an alien with notice that he has been ordered deported.

70. I did not further investigate DiRaimondo's allegations that Kamburowski had not received the final order of removal or other documents. As noted above, while these allegations may be relevant in the context of a motion to reopen filed with an immigration judge or an appeal before the BIA, such allegations (even if true) are irrelevant to the decision whether to arrest the fugitive alien, in the presence of a signed final order of removal and a signed Warrant of Removal/Deportation. Put otherwise, it is the function of the immigration judge, not the Deportation Officer, to investigate and review allegations of this nature. I had confirmed the existence of a valid, signed Warrant of Removal/Deportation and a valid, signed final order of

removal, and this was all the probable cause that was necessary to take the fugitive alien immediately into custody. Arguments and allegations that the alien might wish to raise before an immigration judge or the BIA in the context of a motion to reopen or an appeal are simply not germane to the decision whether to arrest the alien on the basis of the outstanding warrant.

71.     After discussing the file with DiRaimondo, I contacted my supervisor, Cyril Lopez, and informed him that DiRaimondo had asked to receive copies of the Notice to Appear and the final order of removal. Lopez told me that Kamburowski would have to file a request under the Freedom of Information Act to obtain copies of the documents in the file.

72.     I allowed Kamburowski and his wife to talk privately for a while before I proceeded to place Kamburowski under arrest.

73.     After giving Kamburowski a quick pat-down, I removed all valuables from his person. Consistent with the standard procedures and techniques used in effecting the arrest of wanted fugitives, and consistent with my experience and training in arresting fugitives, I then placed metal handcuffs on him, with his hands held out in front of his body, and I placed a belly chain around his waist. The arrest was without incident.

**Events After Kamburowski's Arrest**

74.     After arresting Kamburowski, I transported him to the ICE district office on the 9th Floor of 26 Federal Plaza in Manhattan for processing. While I transported him from Garden City to 26 Federal Plaza, I at no time made any comments to Kamburowski concerning his wife.

75.     After arrival at 26 Federal Plaza, Kamburowski was processed pending assignment to a detention facility. I do not recall if I processed Kamburowski by myself, or whether I was assisted in processing Kamburowski by other ICE staff. During processing, Kamburowski's

handcuffs were removed, and his fingerprints and photo were taken. Also, his biographical information was updated in the DACS system, although I do not recall whether it was me or another individual who specifically updated the system.

76. All the data generated during Kamburowski's arrest and processing was memorialized in a Record of Deportable/Inadmissible Alien (Form I-213). This form was prepared at 26 Federal Plaza and added to Kamburowski's immigration file. Exh. 1, at 14. I also prepared and signed a Record of Deportable Alien (Form I-203), which accompanies a detainee to the facility where he will be held. This, too, was placed in the file. Exh. 1, at 12. I also added fingerprints, photographs, and several DACS and CIS printouts to Kamburowski's immigration file. Exh. 1, at 13, 15-23.

77. To the best of my recollection, during the entire time that Kamburowski was being processed at 26 Federal Plaza, which amounted to approximately one to two hours, Kamburowski's immigration file was either in my direct possession or in my office. I temporarily removed the Notice to Appear, the final order of removal, and the Warrant of Removal/Deportation while the file was at Federal Plaza, in order to make copies for a "work" file. The work file was then turned over to my deportation assistant, after the original documents had been returned to the immigration file. I never at any other time removed any other documents from Kamburowski's immigration file. To my knowledge, no one else ever removed any documents from Kamburowski's immigration file, either during my time at the Garden City CIS office or at 26 Federal Plaza.

78. Having completed Kamburowski's processing at 26 Federal Plaza, I personally transported him to what was then called the Wackenhut Detention Center in Queens, New York ("Wackenhut"). At the time, Wackenhut (a privately operated detention facility) was the only

immigration detention facility in New York City, and it only housed non-criminal aliens. The only occupants of the vehicle in which Kamburowski was transported were me, Kamburowski, and possibly another alien. Another officer followed my vehicle to Wackenhut.

79. Once we arrived at Wackenhut, I escorted Kamburowski inside and turned him over to the guards. I remained at Wackenhut a maximum of 10 minutes.

80. I brought Kamburowski's entire immigration file with me to Wackenhut. Generally, when transporting detainees to Wackenhut, an officer signs in upon delivering a detainee, and leaves the immigration file in an "in-bin" that will eventually go to the deportation officer assigned to the case. I do not recall if I placed the file directly in the "in-bin" or whether I handed it directly to a deportation officer.

81. After transporting Kamburowski to Wackenhut, I had no further contact with Kamburowski, except that he was in attendance during my deposition on September 13, 2006. I was not involved in any decisions or actions relating to Kamburowski's detention, bond, or release, or relating to his immigration status or the reopening of his removal proceedings.

82. On January 22, 2004, I completed a Memorandum of Investigation (Form G-166c) memorializing the circumstances surrounding Kamburowski's arrest the previous day as well as the basis for the arrest. This Memorandum was added to the immigration file. Exh. 1, at 11.

83. On information and belief, John Carbone has also been sued in his individual capacity in this action and was served with a summons and complaint. The case caption describes him as "Acting Field Director, U.S. Immigration and Customs Enforcement." Although I do not believe I ever met Mr. Carbone, it is my understanding that he retired from ICE at least two years ago and no longer works for the agency. At some point in time, he did

serve as Acting Field Director of the Office of Detention and Removal for ICE's New York Field Office, but I do not believe he served in that capacity as of January 22, 2004, the date on which I arrested Kamburowski.

84. In any event, as of January 2004 the position of Field Director, or Acting Field Director, of the Office of Detention and Removal was at least four levels above me in the supervisory chain of command within ICE's New York Field Office. The incumbent in that position would have been in charge of the entire deportation and removal program for the New York District. As such, I did not have any conversations with Mr. Carbone, or with any Field Director or Acting Field Director, either on January 22, 2004, or on any other date, about Kamburowski or about the basis for or circumstances surrounding his arrest. To the best of my knowledge, neither Mr. Carbone nor any Field Director or Acting Field Director was ever involved in any way in either the decision to arrest Kamburowski or in the actual arrest or processing of Kamburowski. I have no idea why Mr. Carbone has been named as a defendant in this action.

I, Michael S. Kidd, do hereby declare on this 5th day of October, 2007, pursuant to 28 U.S.C. § 1746, and under the penalties and pains of perjury, that the above and foregoing is true and correct to the best of my knowledge, information, and belief.

MICHAEL S. KIDD, Deportation Officer
U.S. Immigration and Customs Enforcement
Department of Homeland Security