ORIGINAL

```
                                                           1
 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 3   ----------------------------------------
 4   MICHAEL KAMBUROWSKI and GINA
     KAMBUROWSKI,
 5
                   Plaintiffs,
 6                                          Civil Action
            -against-                       CV-05-953
 7
     MICHAEL KIDD, Deportation Officer,
 8   U.S. Immigration & Customs
     Enforcement, JOHN DOE I, Unknown
 9   Deportation Officer, U.S. Immigration
     & Customs Enforcement, JOHN DOE II,
10   Unknown Supervisory Deportation
     Officer, U.S. Immigration & Customs
11   Enforcement and JOHN CARBONE, Acting
     Field Director, U.S. Immigration &
12   Customs Enforcement,
13                 Defendants.
14   ----------------------------------------
15
                    March 9, 2007
16                  10:03 a.m.
17
18   Deposition of MICHAEL RAPHAEL KAMBUROWSKI, taken by
19   Defendants, pursuant to Notice, held at the United
20   States Attorney's Office, One Pierrepont Plaza,
21   Brooklyn, New York, before Robert E. Levy, a
22   Certified Shorthand Reporter and Notary Public
23   within and for the State of New York.
24
25
```

1       M. Kamburowski

2       A.   I think it was the passport.

3       Q.   Did you ever get or seek an extension of
4  the time that you were permitted to stay in the
5  U.S.?

6       A.   I don't think I did, no.

7       Q.   Did you stay in the United States beyond
8  October of 1995, the time that you thought your
9  tourist visa was valid?

10      A.   Yes.

11      Q.   Why did you stay in the U.S. beyond that
12 time?

13      A.   I received an offer of work.

14      Q.   Where was that at?

15      A.   Americans For Tax Reform in Washington,
16 D.C.

17      Q.   Now, based on your belief that the
18 tourist visa was valid until October 1995, what did
19 you think your immigration status was after October
20 1995?

21      A.   I believed that it had expired, that I
22 was out of status, but through my employer I began
23 applying for an adjustment, an employment-based
24 visa.

25      Q.   What did you think the consequences were

1          M. Kamburowski

2    States in October -- I'm sorry, on January 23, 1995,

3    did you provide the former Immigration and

4    Naturalization Service, which I'll be referring to

5    as the former INS, did you provide the former INS

6    with an address in the United States?

7              MR. MOSELEY: Objection as to form. Are

8         you asking at the time when he was admitted?

9              MR. KIM: Yes.

10             MR. MOSELEY: When he came through

11        whatever airport he came through, you are

12        asking at that time?

13             MR. KIM: Yes, I believe the question

14        was -- and I'll rephrase it.

15        Q.   I'll repeat it. When you first arrived

16   in the U.S. on January 23, 1995, did you provide the

17   former INS with an address in the United States?

18        A.   I gave my address at the airport at LAX

19   when I arrived.

20        Q.   How did you give that address?

21        A.   I believe it was a form that I had to

22   fill out giving my destination address in the United

23   States.

24        Q.   Do you recall what that form was called?

25        A.   No.

M. Kamburowski

    Q.    What address did you provide?

    A.    3202 North Pershing Drive in Arlington, Virginia.

    Q.    What did you believe that address to be or to mean?

    A.    That was the address of the Sacher Intern House run by the Leadership Institute.

    Q.    Why did you provide that address on the form that you gave to the former INS?

    A.    Because that is where -- that was my destination when I arrived in the United States.

    Q.    While at the Sacher Intern House, did you have to pay for your room or have to pay any expenses to stay there?

    A.    No.

    Q.    Is the Sacher House still at 3202 North Pershing?

    A.    I believe so but I don't know.

    Q.    Do you know anyone there who is, who may still be there that was there when you were there?

    A.    Actually I'm not sure it exists because the Leadership Institute moved its offices to Arlington, closer to Washington, and now I think they have an intern facility in their office so it

44

M. Kamburowski

Q. Where is the copy of that lease?

A. If I have it, it would be in my files.

Q. Where are your files generally speaking?

A. Here in New York.

MR. MOSELEY: Just off the record.

(Discussion off the record)

Q. What was your phone number at 11-15 St. Nicholas?

A. 212-662 or 663-8356.

Q. Was that a land line?

A. Yes.

Q. Whose name was that phone number under?

A. Initially it was under Alison Pike's name and then we changed it to either my name or my wife's name or both. I don't remember.

Q. When you changed the name under which the phone was under, did the phone number change?

A. No, we kept the same phone number.

Q. When you moved to 11-15 St. Nicholas did you notify the U.S. Postal Service of your change of address?

A. Yes.

Q. When you moved to 11-15 St. Nicholas did you notify the former INS in any way of your change

1       M. Kamburowski

2  of address?

3       A.  Not formally but we had filed paperwork
4  with our new attorney which had that address on it.

5       Q.  Who was that attorney?

6       A.  Michael DiRaimondo.

7       Q.  When did you file?

8       A.  I think February 2002, although the
9  actual filing I think was in May.  That is when I
10 sat down with Michael and we decided to file what.

11      Q.  What did you file in May 2002?

12      A.  Adjustment of status based on marriage.

13      Q.  Other than filing of that application,
14 did you notify the former INS in your view of your
15 change of address?

16      A.  In my view I think that was notifying
17 the INS where I was at that time.

18      Q.  Right, so other than the filing in May
19 of 05 -- I'm sorry, of '02, did you do anything else
20 to, in your view, notify the former INS of your
21 change of address?

22      A.  Other than that, no.

23      Q.  How long did you live at 11-15
24 St. Nicholas?

25      A.  From June 22, 2001 until May, I'm trying

1          M. Kamburowski

2    23-19 42nd Street in Astoria, Queens. We had

3    physically separated.

4          Q.    Can you repeat --

5          A.    It is 28-19, I'm sorry.

6          Q.    Can you provide the address where you

7    moved to after May 31, 2006?

8          A.    28-19 42nd Street, apartment D5,

9    Astoria, Queens, New York, 11103.

10         Q.    How long did you live at 28-19 42nd

11   Street in Queens?

12         A.    October 2006.

13         Q.    Did you eventually move back in with

14   your wife?

15         A.    Uh-huh.

16         Q.    At the 23 East 128th Street?

17         A.    Yes. I moved a lot of my things there

18   in October and then I went for work-related purposes

19   I went to the Dominican Republic for several months.

20         Q.    When you first arrived in the United

21   States in January 1995, were you aware of any

22   requirements to notify the former INS of any change

23   of address?

24         A.    When I first arrived?  No.

25         Q.    From January 1995 until today, did you

1          M. Kamburowski
2  at any time become aware of any requirement to
3  notify the former INS, now the Department of
4  Homeland Security or DHS, of any requirement to
5  change one's address?
6          A.   Yes.
7          Q.   When did you learn of that?
8          A.   In 2004 when I was incarcerated.
9          Q.   How did you learn about it?
10         A.   Just during the course of the whole
11 ordeal.  I learned there is a form that you file
12 with the former INS every time you move.
13         Q.   Do you recall the name of the form?
14         A.   No, I don't remember the name of the
15 form but I have filed it since then, every time I've
16 moved.
17         Q.   How did you learn of this form?
18         A.   Either through my attorneys, probably
19 through my attorneys.
20         Q.   When you say your attorneys, do you mean
21 your current attorneys?
22         A.   Yes.
23         Q.   They advised you of what while you were
24 at Wackenhut?
25              MR. MOSELEY:  I think we are getting

M. Kamburowski

A. I think my attorneys told me that it would not be successful because we had gotten divorced and so they advised me to file I think it was Form I-751 or something, to remove the condition of marriage from that. I don't know what the technical terms of it are but since we were going to get divorced, they advised me to file that new form and hopefully that would help.

Q. Let me ask this question again. I'll be a little more clear. Prior to today you had not seen Defendants' Exhibit B, correct?

A. I don't recall seeing it.

Q. So prior to today, did you ever learn of a decision either way on your application for adjustment of status based on your marriage to Ms. Sweat?

A. Yes, I did. I know that it was successful because we had gotten divorced, so I was advised that there may be another avenue by filing this new form.

Q. When did you learn that it was unsuccessful?

A. Sometime in '99. Don't recall exactly.

Q. Sometime in '99?

63

M. Kamburowski

A. Uh-huh.

Q. Early 1999, late 1999?

A. I don't remember. I know I got my employment authorization early '99. Sometime after that I probably would have learned that it wasn't successful.

Q. How did you learn that it was unsuccessful sometime in 1999?

A. Probably through my attorneys.

Q. Could you have learned that it was unsuccessful through anyone other than your attorneys?

MR. MOSELEY: Objection as to form.

Answer it.

A. No.

Q. Was there anyone else with knowledge of the status of your application for adjustment of status based on your marriage to Ms. Sweat?

A. No.

Q. By your attorneys do you mean Mr. Allen?

A. Yes.

Q. Did Mr. Allen personally tell you that the application for adjustment of status based on your marriage to Ms. Sweat was unsuccessful?

1          M. Kamburowski

2     A.   Either way it was him or his wife

3   because his wife Susan Allen also was handling the

4   case at that stage, so it was either one of them.

5     Q.   So either Mr. Allen or his wife

6   Ms. Allen told you that your application for

7   adjustment of status based on your marriage to

8   Ms. Sweat was not successful?

9     A.   I believe so.

10    Q.   Did they show you any documents that

11  showed that it was unsuccessful or did they just

12  tell you verbally?

13    A.   I don't remember seeing any documents.

14  They may have but I don't remember.

15    Q.   Do you recall where they told you this?

16    A.   It would have been at their office.

17    Q.   So it was your belief that sometime in

18  1999, your application for adjustment based on your

19  marriage to Ms. Sweat was unsuccessful?

20    A.   Yes.

21    Q.   What did you think the purpose of filing

22  the I-751 was?

23    A.   To remove the condition of marriage from

24  the application.

25    Q.   When you say to remove the condition of