ORIGINAL

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------

MICHAEL KAMBUROWSKI and GINA

KAMBUROWSKI,

                 Plaintiffs,

                            Civil Action

        -against-            CV-05-953

MICHAEL KIDD, Deportation Officer,

U.S. Immigration & Customs

Enforcement, JOHN DOE I, Unknown

Deportation Officer, U.S. Immigration

& Customs Enforcement, JOHN DOE II,

Unknown Supervisory Deportation

Officer, U.S. Immigration & Customs

Enforcement and JOHN CARBONE, Acting

Field Director, U.S. Immigration &

Customs Enforcement,

                 Defendants.

----------------------------------------

               March 9, 2007

               10:03 a.m.

Deposition of MICHAEL RAPHAEL KAMBUROWSKI, taken by

Defendants, pursuant to Notice, held at the United

States Attorney's Office, One Pierrepont Plaza,

Brooklyn, New York, before Robert E. Levy, a

Certified Shorthand Reporter and Notary Public

within and for the State of New York.

1    M. Kamburowski

2         A.    I think it was the passport.

3         Q.    Did you ever get or seek an extension of

4    the time that you were permitted to stay in the

5    U.S.?

6         A.    I don't think I did, no.

7         Q.    Did you stay in the United States beyond

8    October of 1995, the time that you thought your

9    tourist visa was valid?

10        A.    Yes.

11        Q.    Why did you stay in the U.S. beyond that

12   time?

13        A.    I received an offer of work.

14        Q.    Where was that at?

15        A.    Americans For Tax Reform in Washington,

16   D.C.

17        Q.    Now, based on your belief that the

18   tourist visa was valid until October 1995, what did

19   you think your immigration status was after October

20   1995?

21        A.    I believed that it had expired, that I

22   was out of status, but through my employer I began

23   applying for an adjustment, an employment-based

24   visa.

25        Q.    What did you think the consequences were

1          M. Kamburowski

2   States in October -- I'm sorry, on January 23, 1995,

3   did you provide the former Immigration and

4   Naturalization Service, which I'll be referring to

5   as the former INS, did you provide the former INS

6   with an address in the United States?

7          MR. MOSELEY: Objection as to form. Are

8       you asking at the time when he was admitted?

9          MR. KIM: Yes.

10         MR. MOSELEY: When he came through

11      whatever airport he came through, you are

12      asking at that time?

13         MR. KIM: Yes, I believe the question

14      was -- and I'll rephrase it.

15      Q.   I'll repeat it. When you first arrived

16   in the U.S. on January 23, 1995, did you provide the

17   former INS with an address in the United States?

18      A.   I gave my address at the airport at LAX

19   when I arrived.

20      Q.   How did you give that address?

21      A.   I believe it was a form that I had to

22   fill out giving my destination address in the United

23   States.

24      Q.   Do you recall what that form was called?

25      A.   No.

1                    M. Kamburowski

2       Q.   What address did you provide?

3       A.   3202 North Pershing Drive in Arlington,

4  Virginia.

5       Q.   What did you believe that address to be

6  or to mean?

7       A.   That was the address of the Sacher

8  Intern House run by the Leadership Institute.

9       Q.   Why did you provide that address on the

10 form that you gave to the former INS?

11      A.   Because that is where -- that was my

12 destination when I arrived in the United States.

13      Q.   While at the Sacher Intern House, did

14 you have to pay for your room or have to pay any

15 expenses to stay there?

16      A.   No.

17      Q.   Is the Sacher House still at 3202 North

18 Pershing?

19      A.   I believe so but I don't know.

20      Q.   Do you know anyone there who is, who may

21 still be there that was there when you were there?

22      A.   Actually I'm not sure it exists because

23 the Leadership Institute moved its offices to

24 Arlington, closer to Washington, and now I think

25 they have an intern facility in their office so it

1                    M. Kamburowski

2        Q.   Where is the copy of that lease?

3        A.   If I have it, it would be in my files.

4        Q.   Where are your files generally speaking?

5        A.   Here in New York.

6             MR. MOSELEY:  Just off the record.

7             (Discussion off the record)

8        Q.   What was your phone number at 11-15

9   St. Nicholas?

10       A.   212-662 or 663-8356.

11       Q.   Was that a land line?

12       A.   Yes.

13       Q.   Whose name was that phone number under?

14       A.   Initially it was under Alison Pike's

15  name and then we changed it to either my name or my

16  wife's name or both.  I don't remember.

17       Q.   When you changed the name under which

18  the phone was under, did the phone number change?

19       A.   No, we kept the same phone number.

20       Q.   When you moved to 11-15 St. Nicholas did

21  you notify the U.S. Postal Service of your change of

22  address?

23       A.   Yes.

24       Q.   When you moved to 11-15 St. Nicholas did

25  you notify the former INS in any way of your change

1              M. Kamburowski

2    of address?

3         A.   Not formally but we had filed paperwork

4    with our new attorney which had that address on it.

5         Q.   Who was that attorney?

6         A.   Michael DiRaimondo.

7         Q.   When did you file?

8         A.   I think February 2002, although the

9    actual filing I think was in May.  That is when I

10   sat down with Michael and we decided to file what.

11        Q.   What did you file in May 2002?

12        A.   Adjustment of status based on marriage.

13        Q.   Other than filing of that application,

14   did you notify the former INS in your view of your

15   change of address?

16        A.   In my view I think that was notifying

17   the INS where I was at that time.

18        Q.   Right, so other than the filing in May

19   of 05 -- I'm sorry, of '02, did you do anything else

20   to, in your view, notify the former INS of your

21   change of address?

22        A.   Other than that, no.

23        Q.   How long did you live at 11-15

24   St. Nicholas?

25        A.   From June 22, 2001 until May, I'm trying

M. Kamburowski

23-19 42nd Street in Astoria, Queens. We had

physically separated.

     Q.  Can you repeat --

     A.  It is 28-19, I'm sorry.

     Q.  Can you provide the address where you

moved to after May 31, 2006?

     A.  28-19 42nd Street, apartment D5,

Astoria, Queens, New York, 11103.

     Q.  How long did you live at 28-19 42nd

Street in Queens?

     A.  October 2006.

     Q.  Did you eventually move back in with

your wife?

     A.  Uh-huh.

     Q.  At the 23 East 128th Street?

     A.  Yes.  I moved a lot of my things there

in October and then I went for work-related purposes

I went to the Dominican Republic for several months.

     Q.  When you first arrived in the United

States in January 1995, were you aware of any

requirements to notify the former INS of any change

of address?

     A.  When I first arrived?  No.

     Q.  From January 1995 until today, did you

1             M. Kamburowski

2   at any time become aware of any requirement to

3   notify the former INS, now the Department of

4   Homeland Security or DHS, of any requirement to

5   change one's address?

6             A.    Yes.

7             Q.    When did you learn of that?

8             A.    In 2004 when I was incarcerated.

9             Q.    How did you learn about it?

10            A.    Just during the course of the whole

11  ordeal.  I learned there is a form that you file

12  with the former INS every time you move.

13            Q.    Do you recall the name of the form?

14            A.    No, I don't remember the name of the

15  form but I have filed it since then, every time I've

16  moved.

17            Q.    How did you learn of this form?

18            A.    Either through my attorneys, probably

19  through my attorneys.

20            Q.    When you say your attorneys, do you mean

21  your current attorneys?

22            A.    Yes.

23            Q.    They advised you of what while you were

24  at Wackenhut?

25            MR. MOSELEY:  I think we are getting

M. Kamburowski

A.    I think my attorneys told me that it

would not be successful because we had gotten

divorced and so they advised me to file I think it

was Form I-751 or something, to remove the condition

of marriage from that.  I don't know what the

technical terms of it are but since we were going to

get divorced, they advised me to file that new form

and hopefully that would help.

Q.    Let me ask this question again.  I'll be

a little more clear.  Prior to today you had not

seen Defendants' Exhibit B, correct?

A.    I don't recall seeing it.

Q.    So prior to today, did you ever learn of

a decision either way on your application for

adjustment of status based on your marriage to

Ms. Sweat?

A.    Yes, I did.  I know that it was

successful because we had gotten divorced, so I was

advised that there may be another avenue by filing

this new form.

Q.    When did you learn that it was

unsuccessful?

A.    Sometime in '99.  Don't recall exactly.

Q.    Sometime in '99?

M. Kamburowski

1

2      A.    Uh-huh.

3      Q.    Early 1999, late 1999?

4      A.    I don't remember.  I know I got my

5 employment authorization early '99.  Sometime after

6 that I probably would have learned that it wasn't

7 successful.

8      Q.    How did you learn that it was

9 unsuccessful sometime in 1999?

10      A.    Probably through my attorneys.

11      Q.    Could you have learned that it was

12 unsuccessful through anyone other than your

13 attorneys?

14           MR. MOSELEY:  Objection as to form.

15           Answer it.

16      A.    No.

17      Q.    Was there anyone else with knowledge of

18 the status of your application for adjustment of

19 status based on your marriage to Ms. Sweat?

20      A.    No.

21      Q.    By your attorneys do you mean Mr. Allen?

22      A.    Yes.

23      Q.    Did Mr. Allen personally tell you that

24 the application for adjustment of status based on

25 your marriage to Ms. Sweat was unsuccessful?

M. Kamburowski

A.    Either way it was him or his wife

because his wife Susan Allen also was handling the

case at that stage, so it was either one of them.

Q.    So either Mr. Allen or his wife

Ms. Allen told you that your application for

adjustment of status based on your marriage to

Ms. Sweat was not successful?

A.    I believe so.

Q.    Did they show you any documents that

showed that it was unsuccessful or did they just

tell you verbally?

A.    I don't remember seeing any documents.

They may have but I don't remember.

Q.    Do you recall where they told you this?

A.    It would have been at their office.

Q.    So it was your belief that sometime in

1999, your application for adjustment based on your

marriage to Ms. Sweat was unsuccessful?

A.    Yes.

Q.    What did you think the purpose of filing

the I-751 was?

A.    To remove the condition of marriage from

the application.

Q.    When you say to remove the condition of